[No. G001275. Fourth Dist., Div. Three. Jan. 24, 1986.]

EDWARD S. SALKIN, Plaintiff and Appellant, v.
CALIFORNIA DENTAL ASSOCIATION et al.,
Defendants and Respondents.

## COUNSEL

Joe A. Dickerson for Plaintiff and Appellant.

Pepper, Hamilton & Scheetz, Jesse D. Miller, Peter H. Mason, James A. Howell, Peterson, Ross, Schloerb & Seidel, Peter M. Sfikas and John W. Heinemann for Defendants and Respondents.

## OPINION

**CROSBY, J.**—May a petition in mandate alleging a member of a private professional association was denied procedural due process in a disciplinary proceeding state a cognizable cause of action where the punishment imposed is less than expulsion? *Yes.*

I

Orthodontist Edward S. Salkin was publicly censured by two related private professional organizations of dentists of which he is a member, the California and American Dental Associations. His petition, alleging he was denied due process in violation of the bylaws and suffered damage to his dental practice and professional reputation as a result, sought to overturn

the censure and to require a new hearing of the charges against him. Both organizations demurred. They argued, and the superior court agreed, judicial review of the disciplinary procedures of private professional organizations is, as a matter of law, only available where the punishment imposed is expulsion or exclusion from membership.

The California Dental Association is a constituent organization of the American Dental Association, and Salkin belongs to both. Each organization is voluntary; and membership is not required in order to practice dentistry or any dental specialty in this state, although Salkin's last amended petition alleges CDA "exercises a degree of control and discipline over all licensed dentists of California." (But see Bus. & Prof. Code, § 1611, which subjects dentists to licensing and regulation by the State Board of Dental Examiners.) CDA's disciplinary authority over its members is delineated in the ADA bylaws. Salkin pleads, "Respondent has a clear and present duty to deal fairly and equitably with all of its members in all of its functions, and specifically has those obligations as it affects its members' rights to fair hearings, appeals and disciplinary proceedings under its by-laws."

The petition goes on to allege Salkin was informed by CDA on September 3, 1982, he would be expelled unless he returned $1,675 in fees collected from the parents of two juvenile patients. The discipline was based on an August 17, 1978 recommendation of the peer review committee of its member organization, the Orange County Dental Association. It read in part as follows: "The orthodontic specialty Peer Review Committee of the California State Society of Orthodontists was called upon to evaluate the patients and the records. They reviewed the diagnostic records taken prior to treatment, and those taken at the time of transfer. The patients were also examined clinically. [¶] Their findings showed that there had been no progress in correcting James' malocclusion during the year of treatment, and that Jill's malocclusion had worsened during the eight months she was under orthodontic care. They felt the original treatment plans were in error and the mechanotherapy used could not produce an improvement in either esthetics or occlusion."

Salkin was advised he could appeal the decision based on the sufficiency of the evidence or any defects in the procedure followed by the local committee. His attorney then requested the right to review the evidence offered at the hearing, which neither he nor his client was permitted to attend, and any transcript or record of the proceedings. CDA declined: "In [an] effort to provide further clarification for you on CDA's position with regard to this and similar requests, Section 1157 of the California Evidence Code is cited. Specifically it states . . . 'neither the proceedings nor the records of . . . dental review committees . . . . shall be subject to discovery.'"

Salkin next appealed to the ADA. On June 2, 1983, the Council on By-laws and Judicial Affairs of the ADA reduced the proposed penalty from expulsion to censure and issued a six-page opinion, which is attached as an exhibit to the petition. The opinion, in so many words, appears to concede Salkin's case was not handled fairly or in accordance with the bylaws. Excerpts appear in the margin.[1]

## II

■ If the discipline imposed had amounted to expulsion or exclusion from membership, the associations concede Salkin would have been entitled to procedural due process as that concept has been defined in our law: "Adequate notice of charges and a reasonable opportunity to respond are basic to both due process and fair procedure. (*Applebaum* v. *Board of Directors* [1980] 104 Cal.App.3d [648,] 657 [163 Cal.Rptr. 831].) . . . [¶]

---

[1]"The Council is troubled . . . by . . . the inadequacies of the hearing before the peer review committee. The Appellant appeared in person, with counsel, before this Council and again commented upon the extremely brief hearing which he was afforded by the OCDS peer review committee. The Appellant stated that he had elected a conservative course of treatment because he was concerned about the level of the patient's cooperation. He therefore elected to commence treatment without any tooth removal. However, affording the Appellant less than five minutes to state his case did not give an opportunity to adequately present this position. Nor did the time granted afford an opportunity for the peer review panel to confront the Appellant with the [California State Society of Orthodontics] advisory opinion and permit him to confront the issues it raised. The confusion as to the amount in question to be refunded is an indication that the limited time afforded the Appellant did not allow a full examination of all the facts and issues involved. [¶] It is especially notable that at the time the limited hearing was afforded to the Appellant, the OCDS peer review committee had already reached a prior determination adverse to the Appellant in a prior proceeding. The hearing was afforded only after the Appellant on appeal had asserted the validity [*sic*] of the proceedings because of his denial of a hearing. Under such circumstances, it would appear incumbent upon the OCDS to afford the Appellant ample time to state his position. The Council sees nothing in the *California Evidence Code* [provision] in question [section 1157] which would have prevented the OCDS peer review committee from discussing various aspects of the specialist's committee opinion with the Appellant so the Appellant could be apprised of the facts which the committee was considering. This would have afforded the Appellant an opportunity to meet the issues. This was not done. [¶] The preface of the *Peer Review Procedure Manual* of the Council on Dental Care Programs of the American Dental Association provides 'It is not only essential that justice be done; it must be perceived to have been done.' This admonition does not appear to have been followed in this case. The Council notes that in the majority of the constituent dental societies, peer review is a voluntary proceeding. Calforina [*sic*], however, by Section 3 of its *Code of Ethics,* requiring compliance with the mandates of peer review committees as a matter of professional ethics, renders cooperation with peer review committees mandatory. In doing such, it is incumbent upon the California Dental Association to assure that due process is provided to the participants in such proceedings. *Cf. Hackethal* v. *California Medical [Assn.* (1982) 138 Cal.App.3d 435] (outlining principles of fair procedures for disciplinary hearings). . . . [¶] The Council believes that the penalty of expulsion is too harsh to impose . . . . In view of the age of this case, a remand would not serve the interests of either party. Therefore, the Council affirms the decision of the CDA Judicial Council, but believes that justice requires reducing the penalty imposed from expulsion to censure."

There must be an opportunity to confront and cross-examine the accusers and to examine and refute the evidence. (*Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 144 [231 P.2d 6, 21 A.L.R.2d 1387].)" [¶] The individual must have the opportunity to present a defense. (*Pinsker* v. *Pacific Coast Society of Orthodontists* [1974] 12 Cal.3d [541,] 555 [116 Cal.Rptr. 245, 526 P.2d 253].)" (*Hackethal* v. *California Medical Assn.* (1982) 138 Cal.App.3d 435, 442 [187 Cal.Rptr. 811].)

■ Nonetheless, the associations claim the reduction of the discipline imposed from expulsion to censure eliminates Salkin's right to petition for relief. There is some backhanded support for that notion. For example, the *Hackethal* case, cited by the ADA Council itself, does view the problem of judicial interference with the membership relations of private associations in that context (which is not surprising since only expulsion was involved there): "Fair procedure is a developing concept in California. It is applicable when an organization makes a decision to exclude or expel an individual. It is a common law principle under which a private organization is legally required to refrain from arbitrary action. The action to exclude or expel must be substantively rational and procedurally fair." (*Id.*, at p. 441.) Although discipline short of expulsion was not at issue there, defendants insist the import of *Hackethal* is that judicial review of professional disciplinary proceedings is precluded where a lesser sanction is imposed. We decline to endorse the inference, however: It is supported neither in logic nor, as we shall see, law.

Defendants' reliance on *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] is also misplaced. *Pinsker* is an exclusion case. The Society of Orthodontists argued against judicial scrutiny of a decision to exclude an individual from membership based on the significant difference between exclusion of a nonmember and expulsion of a member. There is no doubt that the membership contract, particularly as evidenced in the bylaws, is an important justification offered for judicial intervention in many of the cases. (See, e.g., *Bernstein* v. *Alameda etc. Med. Assn.* (1956) 139 Cal.App.2d 241, 253 [293 P.2d 862].) Thus, to the extent judicial intervention might be justified on contract principles and an organization's duty to its members, the society's position was reasonable enough. Nevertheless, the Supreme Court rejected the contention and extended procedural due process protections to excluded nonmembers of professional organizations. This holding hardly seems helpful to the present defendants.

Moreover, dictum in *Pinsker* is not supportive of the conclusion urged by the associations; for at one point in its opinion the court approves judicial intervention in cases involving discipline less than expulsion: " 'In this state

"a member of an unincorporated association may not be *suspended* or expelled . . . without charges, notice and a hearing, even though the rules of the association make no provision therefor." ' (*Swital* v. *Real Estate Commissioner* [1953] 116 Cal.App.2d 677, 679 [254 P.2d 587]; *Cason* v. *Glass Bottle Blowers Assn., supra,* 37 Cal.2d 134, 143-144.) This requirement of procedural fairness has been an established part of the California common law since before the turn of the century. (See, e.g., *Von Arx* v. *San Francisco G. Verein* [1896] 113 Cal. 377 [45 P. 685]; *Otto* v. *Tailors P. & B. Union* [1896] 75 Cal. 308, 314-315 [17 P. 217].)" (*Id.,* at p. 553, italics added.)

Defendants have produced exactly no case authority directly supporting their claim that judicial enforcement of procedural due process in disciplinary proceedings of private professional organizations will be reserved to expulsion or exclusion cases. But our research has yielded several cases in which the courts have squarely held, in accordance with the *Pinsker* dictum, that suspension cases will be afforded the same scrutiny accorded those involving expulsion. In *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440 [120 P.2d 79], a prehearing suspension of three unincorporated labor unions from the national association was overturned in these words: "It is settled however in this state and elsewhere that a member of an unincorporated association may not be suspended or expelled, nor a subordinate body suspended or its charter revoked, without charges, notice and a hearing, even though the rules of the association make no provision therefor." (*Id.,* at pp. 443-444.)

And the notion was not new in *Ellis. Grand Grove A. O. of D.* v. *Duchein* (1894) 105 Cal. 219[2] [38 P. 947] and *Knights of Ku Klux Klan* v. *Francis* (1926) 79 Cal.App. 383 [249 P. 539] reached the same conclusion years earlier: "It is well settled that a member of a benevolent association cannot be expelled without being given a hearing, and that a by-law which authorizes such a course is unreasonable and without effect [citations]; and the same rules are applicable whether the action of the body is an absolute severing of the relations or a suspension by which the rights of the suspended party are destroyed or impaired. There is no distinction in principle between expelling a member from a subordinate [organization] and revoking the charter of the [member] itself or suspending its charter." (*Grand Grove A. O. of D.* v. *Duchein, supra,* at p. 225.)

Nor is the concept that the courts *will* interfere in appropriate cases where the discipline falls short of expulsion outdated. In *California State Univer-*

---

[2]The full title of the case is worth remembering every century or so: *The Grand Grove of the United Ancient Order of Druids of California* v. *The Garibaldi Grove, No. 71, of the United Ancient Order of Druids and C. Duchein.*

*sity, Hayward* v. *National Collegiate Athletic Assn.* (1975) 47 Cal.App.3d 533 [121 Cal.Rptr. 85], the Court of Appeal held an NCAA suspension of a college football team from postseason play for alleged violations of eligibility rules was subject to judicial review. The court observed, "Defendant NCAA contends that the trial court erred in failing to follow the doctrine of judicial abstention from interference in the affairs of a private voluntary association. However, courts will intervene in the internal affairs of associations where the action by the association is in violation of its own bylaws or constitution. 'It is true that courts will not interfere with the disciplining or expelling of members of such associations where the action is taken in good faith and in accordance with its adopted laws and rules. But *if the decision of the tribunal is contrary to its laws or rules, or it is not authorized by the by-laws of the association, a court may review the ruling of the board and direct the reinstatement of the member.*' [Citations.]" (*Id.,* at p. 539.) Thus, according to the *Hayward* court, "disciplining" is sufficient to invoke judicial protection of due process rights.

Courts in other jurisdictions have agreed. For example, in *Gashgai* v. *Maine Medical Association* (Me. 1976) 350 A.2d 571, which relies in part on the *Hayward* decision, a doctor sought and obtained an injunction to prevent circulation by a private voluntary medical association of an investigative report concerning his billing practices. The report recommended plaintiff be "severely reprimanded." (*Id.,* at p. 573.) The Supreme Judicial Court of Maine upheld the injunction because the document "imminently threatened . . . injury which was irreparable because it tended to impair Dr. Gashgai's opportunity to earn a livelihood through the practice of his chosen profession and, therefore, required the injunctive relief ordered." (*Id.,* at p. 574.) Public censure, the discipline imposed in this case, is virtually identical in its nature and possible consequences.

The Supreme Court of Florida reached a similar conclusion in *McCune* v. *Wilson* (Fla. 1970) 237 So.2d 169. In approving an injunction against a disciplinary proceeding involving a member of the South Florida chapter of the American Institute of Real Estate Appraisers, the court explained its departure from the usual rule of judicial abstention in cases involving the dealings of private associations: "Professional organizations, although voluntary in nature, often attain a quasi-public significance. In public view, membership in such organizations may appear to be a tangible demonstration of professional competence and skill, professional responsibility, and acceptance by one's professional peers. The fact that an individual member expelled from membership may not be prohibited from practicing his chosen occupation or profession is not a sufficient test to determine whether he needs and is entitled to judicial protection from unfair proceedings or ar-

bitrary actions. When a voluntary association achieves this quasi-public status, due process considerations come into play. . . ." (*Id.*, at p. 172.)

Here, both defendant associations are of "quasi-public significance." Even if they were not, however, the discipline imposed was *public* censure; and the associations could be seen to have created their own exception.

Nor, as we have previously concluded above, is expulsion required as a prerequisite to judicial intervention: "Disciplinary action against a member of a professional organization, although falling short of expulsion from occupation, may have an import which transcends the organization itself because it conveys to the community that the disciplined member was found lacking by his peers. For this reason, it is suitable and proper that an organization, whether a domestic or foreign nonprofit corporation, or a non-chartered nonprofit association, be held to reasonable standards of due process and fairness, especially those inherent in its own by-laws, rules or customs." (*Ibid.*)

Then, in words which could have been written for this case, the court adds, "While the courts should be [loath] to intervene in purely private organizational matters, nonintervention is not justified where a quasi-public organization takes action and imposes penalties which carry the odor of public sanctions. It is clear that not all private associations must observe due process standards. However, such standards must be observed when a private association becomes quasi-public, assumes a public purpose of its own, incorporates and seeks the tax shelters and other protections of public law, or otherwise assumes a larger purpose or stature than pleasant, friendly and congenial social relationships." (*Ibid.*)

For the guidance of the court in the further disposition of this case on remand, we adopt these final words of the Florida Supreme Court: "We hold that a private organization, . . . if tinged with public stature or purpose, may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided for in organization by-laws, carried forward in an atmosphere of good faith and fair play." (*Id.*, at p. 173.) Salkin's petition was sufficient to put each of the above elements in issue; and he did seek the appropriate remedy, a writ of mandate. (*Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 482-485 [131 Cal.Rptr. 90, 551 P.2d 410].)

The judgment is reversed with directions to overrule the demurrer and proceed in accordance with the views expressed above. Salkin is entitled to costs on appeal.

Trotter, P. J., and Wallin, J., concurred.

A petition for a rehearing was denied February 19, 1986, and the petition of respondent California Dental Association for review by the Supreme Court was denied May 1, 1986.