Opinion
KENNARD, J.
After removal from defendant insurance company’s “preferred provider” lists, plaintiff physician brought this action. Citing the common law right to fair procedure, which forbids arbitrary expulsions from private organizations under certain circumstances, plaintiff alleged he should have been given reasonable notice and an opportunity to be heard before his removal.
We first applied the common law doctrine of fair procedure in the late 19th century in two cases involving membership expulsions that adversely affected rights in specified funds held by the organization. Some 50 years later, relying on the general principles underlying this doctrine, we held in James v. Marinship Corp. (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] (Marinship) that a union could not arbitrarily deny full membership *1064 privileges to African-American workers. Thereafter, in the 1960’s and 1970’s, we extended the doctrine in a trio of decisions, Pinsker v. Pacific Coast Soc. of Orthodontists (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] (Pinsker I), Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] (Pinsker II), and Ezekial v. Winkley (1977) 20 Cal.3d 267 [142 Cal.Rptr. 418, 572 P.2d 32] (Ezekial). The two Pinsker cases involved the exclusion of a dentist from professional organizations, while Ezekial pertained to a hospital’s expulsion of a surgical resident.
The general principles this court enunciated in the Marinship-Pinsker-Ezekial decisions apply in this case as well.
I
On September 10, 1990, Metropolitan Life Insurance Company (MetLife) entered into an agreement with Dr. Louis E. Potvin, an obstetrician and gynecologist, to include him as one of 16,000 participants on two of its preferred provider lists. Potvin had practiced medicine for more than 35 years; he was a past president of the Orange County Medical Association; and he held full staff privileges at Mission Regional Hospital, where he had served as Chairman of the Obstetrics and Gynecology Department for nine years. Under the contract, Potvin was to provide medical services to MetLife’s insureds in return for agreed-upon payment by MetLife. The agreement created no employment or agency relationship, and it allowed Potvin to also “contract with other preferred provider organizations, health maintenance organizations or other participating provider arrangements.” It provided for termination by either party “at any time, with or without cause, by giving thirty (30) days prior written notice to the other party.”
On July 22, 1992, MetLife notified Potvin in writing that effective August 31, 1992, it was terminating his preferred provider status. Potvin asked for clarification; MetLife replied that the termination, which the parties here also refer to as “delistment,” was consistent with the contract, which allowed termination “without cause.” When Potvin insisted on a further explanation, MetLife reiterated its right to terminate without cause. MetLife then stated that even though it did not have to give a reason, Potvin’s “delistment from the provider network was related to the fact that [he] did not meet [MetLife’s] current selection and retention standard for malpractice history.” At the time, MetLife would not include or retain on its preferred provider lists any physician who had more than two malpractice lawsuits, or who had paid an aggregate sum of $50,000 in judgment or settlement of such actions. Potvin’s patients had sued him for malpractice on four separate occasions, *1065 all predating his 1990 agreement with MetLife. In three of these actions, the plaintiffs had abandoned their claims, while the fourth case had settled for $713,000.
After MetLife failed to respond to Potvin’s request for a hearing, Potvin filed this lawsuit. His complaint set forth two causes of action, one entitled “Violation of Business and Professions Code section 805 et seq. and for Violation of Fair Procedure,” the other claiming breach of the preferred provider contract. Potvin alleged that MetLife’s termination of his preferred provider status devastated his practice, reducing it to “a small fraction” of his former patients. He asserted that he was required to reveal his termination to other insurers and managed care entities, which then removed him from their preferred provider lists, and that he suffered rejection by “physician groups . . . dependent upon credentialling by MetLife” and by current MetLife preferred provider physicians, who ceased referring patients to him.
The trial court granted MetLife’s motion for summary judgment. It agreed with MetLife that Potvin’s complaint did not allege a claim for violation of the common law right to fair procedure, and it refused Potvin’s request to amend his complaint to add such a claim. On the breach of contract claim, the trial court ruled that MetLife had validly exercised its right under the preferred provider agreement to terminate its relationship with Potvin with or without cause with 30 days’ written notice. With regard to the asserted violation of Business and Professions Code section 805 et seq., the trial court concluded that those provisions, which govern peer review of a licensed health care facility’s decision to terminate a physician’s medical privileges, were inapplicable to the preferred provider agreement between MetLife and Potvin.
The Court of Appeal reversed. It disagreed with the trial court that Potvin’s complaint failed to allege a claim for violation of the common law right to fair procedure. It also held that, before removing Potvin from its preferred provider lists, MetLife should have given him notice of the grounds for its action and a reasonable opportunity to be heard. With respect to Potvin’s assertion that the removal violated Business and Professions Code section 805 et seq. setting forth procedures for physician peer review, the Court of Appeal agreed with the trial court that those provisions did not apply to the preferred provider contract involved here.
We granted MetLife’s petition for review.[1] We affirm the Court of Appeal’s reversal of the trial court’s grant of summary judgment for *1066 MetLife, but we disagree with the Court of Appeal that MetLife necessarily must comply with the common law doctrine of fair procedure before removing physicians from its preferred provider lists. In this case, that issue needs to be resolved by further proceedings in the trial court under the standards set forth below.
II
The purpose of the common law right to fair procedure is to protect, in certain situations, against arbitrary decisions by private organizations. As this court has held, this means that, when the right to fair procedure applies, the decisionmaking “must be both substantively rational and procedurally fair.” (Pinsker II, supra, 12 Cal.3d at p. 550.)
. This court first applied the common law right to fair procedure in two late 19th century decisions, Otto v. Tailors' P. & B. Union (1888) 75 Cal. 308 [17 P. 217] (Otto) and Von Arx v. San Francisco G. Verein (1896) 113 Cal. 377 [45 P. 685] (Von Arx), both of which involved an association’s membership expulsions that adversely affected rights in specified funds held for the association’s members. We held in Otto that an unincorporated trade union’s expulsion of a member for an offense subject only to a fine was “not in good faith, was not fair, and was contrary to natural justice.” (Otto, supra, at p. 315.) And in Von Arx we said that a social and mutual aid society of Swiss immigrants could expel a member only if it gave “reasonable notice of the proceeding . . . and a fair opportunity of presenting [a] defense in accordance with general principles of law and justice.” (Von Arx, supra, at pp. 379-380.) In each case, we justified court intervention as necessary to protect the affected member’s property rights in the funds in question against arbitrary deprivation by the association. (Otto, supra, at p. 311 [Otto was “a regular member ... of the benevolent fund branch of the association, and entitled to its pecuniary benefits”]; Von Arx, supra, at p. 379 [Von Arx had contributed $1,000 of the $15,000 held by the association for the benefit of its members].)
*1067 Almost 50 years later, we drew on those principles to prevent a labor union and an employer from discriminating against African-American workers on the arbitrary basis of their race. In Marinship, supra, 25 Cal.2d 721, a unanimous decision authored by Chief Justice Phil S. Gibson, we upheld an injunction restraining the labor union and the employer, a Marin County shipbuilder, from “discharging or causing the discharge of . . . Negro employees because they are not members of a labor union with which their employer has a closed shop agreement, but which will not grant Negroes full membership privileges.” (Id. at pp. 724-725.) We rejected the union’s contention that it “may, for any arbitrary reason whatsoever, entirely close its membership to otherwise qualified persons and at the same time may, by enforcing a closed shop contract, demand union membership as a condition to the right to work.” (Id. at p. 730.)
We explained: “It was well established at common law that innkeepers and common carriers were under a duty to furnish accommodations to all persons, in absence of some reasonable ground .... The analogy of the public service cases . . . refutes defendants’ contention that a statute is necessary to enforce such a policy where private rather than public action is involved. [¶] Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason [of their race]. Use of economic pressure, by a union that does not admit Negroes, to compel the discharge of Negro employees may be enjoined.” (Marinship, supra, 25 Cal.2d at p. 740.)
Thereafter, in the 1960’s and 1970’s, we applied these fair procedure principles in a trio of cases involving licensed dental and medical professionals. The first of these cases was Pinsker I, supra, 1 Cal.3d 160. There, we held that a dentist specializing in orthodontics and rejected for membership in local, regional, and national associations of orthodontists had “a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection.” (Id. at p. 166.) We noted that under California’s Dental Practice Act a dentist seeking to specialize in orthodontics needed no separate license; but if a dentist wished to obtain private certification as a “Diplómate” in orthodontics, membership in the defendant associations was, “if not absolutely essential, at least extremely helpful.” (Id. at p. 163.)
We said: “Because of the unique position in the field of orthodontics occupied by defendant [associations], membership therein, although not economically necessary in the strict sense of the word . . . , would appear to be a practical necessity for a dentist who wishes not only to make a good *1068 living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty. Defendant associations hold themselves out to the public and the dental profession generally as the sole organizations recognized by the [American Dental Association], which is itself a virtual monopoly, to determine standards, both ethical and educational, for the practice and certification of orthodontics. Thus, a public interest is shown, and the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications.” (Pinsker I, supra, 1 Cal.3d at p. 166.) To support our conclusion that the defendant associations had a “fiduciary responsibility” {ibid.), we relied on a then-recent law review article, The Individual and the Public Service Enterprise in the New Industrial State (1967) 55 Cal. L.Rev. 1247, authored by Mathew O. Tobriner (at that time a justice of this court) and Joseph R. Grodin (then a practicing lawyer but later a justice of this court).
We remanded the matter to allow the defendant associations of orthodontists an opportunity to show that their exclusion of the plaintiff was not arbitrary or capricious. (Pinsker I, supra, 1 Cal.3d at pp. 166-167.) On remand, the defendant associations gave this reason for not accepting the plaintiff as a member: Although the plaintiff had completed the postgraduate course work required for membership, his partner in the dental practice had not. After learning from a member that the plaintiff and his partner “shared” patients, the defendant organizations expressed concern that this sharing might violate a principle of ethics governing their members that an orthodontist “ ‘not delegate] to a person less qualified any service or operation which requires the professional competence of an orthodontist,’ ” and on this basis they rejected the plaintiff’s membership application without giving him an opportunity to be heard. (Pinsker II, supra, 12 Cal.3d at p. 546.) The trial court ruled that the defendants’ membership rejection was not arbitrary. (Id. at p. 549.) The court also found that by conducting some investigation into the matter, the defendants had satisfied the requirements of procedural fairness. (Ibid.)
We disagreed. We rejected the defendants’ claim that under Pinsker I, supra, 1 Cal.3d 160, they need only show that as a substantive matter the rejection of the plaintiff’s membership application was rational. (Pinsker II, supra, 12 Cal.3d at p. 550.) That argument, we pointed out, ignored the common law precedents on which Pinsker I rested: “Taken together, these decisions establish the common law principle that whenever a private association is legally required to refrain from arbitrary action, the association’s action must be both substantively rational and procedurally fair.” (Pinsker II, supra, at p. 550.) We remanded the case to give Pinsker “a fair opportunity to answer the charges against him.” {Id. at p. 561.)
*1069 Three years later we decided Ezekial, supra, 20 Cal.3d 267. In that case, Kaiser Foundation Hospital had invited the plaintiff physician, a San Diego general practitioner, to join Kaiser’s surgical residency program in Los Angeles. To accept the offer, the plaintiff had to close his medical practice and move his family. He entered Kaiser’s four-year surgical residency program in Los Angeles, but after one and one-half years Kaiser terminated him without notice and a hearing. This court concluded that the plaintiff’s allegation that the dismissal would “effectively prevent his entry into the medical specialty for which his [surgical] residency training was preparing him” was sufficient to entitle him to “rudimentary procedural and substantive fairness.” (Id. at p. 278.)
We explained: “The underlying rationale of the Marinship-Pinsker line of cases is that certain private entities possess substantial power either to thwart an individual’s pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced.” (Ezekial, supra, 20 Cal.3d at p. 272, citing Tobriner & Grodin, The Individual and the Public Service Enterprise in the New Industrial State, supra, 55 Cal. L.Rev. at p. 1255.) “The Marinship-Pinsker principles,” we said, primarily precluded “arbitrary exclusions from membership in private associations,” and were “narrowly applied to situations with substantial economic ramifications.” (Ezekial, supra, at p. 272.) We went on to say: “Prior to Marinship, however, it was established that one may not be expelled from membership in a private association without charges, notice and hearing. This common law protection against arbitrary expulsion, judicially declared, is of broader application and has been extended not only to labor unions [citations] and professional and trade organizations [citations], but to mutual benefit societies [citations] and other fraternal and social groups [citation]. The underlying theme of these decisions, variously stated, is that membership in an association, with its associated privileges, once attained, is a valuable interest which cannot be arbitrarily withdrawn. Thus, they comport with the broader principle that one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit.” (Id. at pp. 272-273, original italics.)
We further reasoned in Ezekial: “In California, a licensed physician or dentist is legally and fully qualified to practice in the field encompassed within his license; the state imposes no additional legal requirements for practice of a medical or dental specialty. To ensure higher standards of competence and ethics, however, these professions have adopted extensive systems of post-license private regulation. Through professional society memberships, specialty certification requirements, and hospital admission policies, the professions can effectively control the individual licensee’s *1070 practical ability to utilize the license conferred.” (Ézekial, supra, 20 Cal.3d at p. 273.)
III
The private organizations in our Marinship-Pinsker-Ezekial cases (respectively, a labor union; local, regional, and national- associations of orthodontists; and a hospital offering a surgical residency program) all shared an attribute of significance in our determination that they were subject to the common law right to fair procedure. Each one was a private entity affecting the public interest. As has been recognized: “[C]ertain institutions and enterprises are viewed by the courts as quasi-public in nature: The important products or services which these enterprises provide, their express or implied representations to the public concerning their products or services, their superior bargaining power, legislative recognition of their public aspect, or a combination of these factors, lead courts to impose on these enterprises obligations to the public and the individuals with whom they deal, reflecting the role which they have assumed, apart from and in some cases despite the existence of a contract.” (Tobriner & Grodin, The Individual and the Public Service Enterprise in the New Industrial State, supra, 55 Cal. L.Rev. at p. 1253, fns. omitted.)
Plaintiff here points out that when an insurance company with fiduciary obligations to its insureds maintains a list of preferred provider physicians to render medical services to the insureds, a significant public interest is affected. One practical effect of the health care revolution, which has made quality care more widely available and affordable through health maintenance organizations and other managed care entities, is that patients are less free to choose their own doctors for they must obtain medical services from providers approved by their health plan. The Managed Health Care Improvement Task Force stressed in its 1997 report to the California Legislature that the provision of health care “has a special moral status and therefore a particular public interest.” (Cal. Managed Health Care Improvement Task Force, Rep. to Leg. (Dec. 13, 1997) Government Regulation and Oversight of Managed Health Care, Findings and Recommendations, p. 1.) But an even greater public interest is at stake when those medical services are provided through the unique tripartite relationship among an insurance company, its insureds, and the physicians who participate in the preferred provider network. As the New Hampshire Supreme Court noted recently in Harper v. Healthsource New Hampshire (1996) 140 N.H. 770 [674 A.2d 962, 966 ], the removal of a physician from a preferred provider list “affects more than just [the doctor’s] own interest,” adding that “[t]he public has a substantial interest in the relationship between health maintenance organizations and their preferred provider physicians.”
*1071 Our conclusion that the relationship between insurers and their preferred provider physicians significantly affects the public interest does not necessarily mean that every insurer wishing to remove a doctor from one of its preferred provider lists must comply with the common law right to fair procedure. The obligation to do so arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest.[2]
In our Marinship-Pinsker-Ezekial cases, the private entities each had substantial power that significantly impaired the affected individuals’ ability to work in a particular field or profession. In Marinship, the union exercised “a monopoly of the supply of labor” (Marinship, supra, 25 Cal.2d at p. 731); in the two Pinsker cases, the orthodontic associations operated “a virtual monopoly” while “determin[ing] standards, both ethical and educational,” for the practice of that profession (Pinsker I, supra, 1 Cal.3d at p. 166; accord, Pinsker II, supra, 12 Cal.3d at p. 544); and in Ezekial, the hospital’s surgical residency program was part of an “extensive system[] of post-license private regulation” (Ezekial, supra, 20 Cal.3d at p. 273).
Here, plaintiff’s amici curiae, the American Medical Association and the California Medical Association, assert in their joint brief that “the managed care organizations operating in California hold substantial economic power over physicians and their patients.” They also contend that “the control exercised by managed care organizations makes access to provider panels a ‘practical prerequisite’ to any effective practice as a health care provider.” Various legal commentators agree. (See Little, Managed Care Contracts of Adhesion: Terminating the Doctor-Patient Relationship and Endangering Patient Health (1997) 49 Rutgers L.Rev. 1397, 1448 [“Many physicians rely on [managed care] participation to maintain their practices”]; Kadzielski et al., Managed Care Contracting: Pitfalls and Promises (1998) 20 Whittier L.Rev. 385, 387, 405 [asserting that managed care plans administer employer-provided health care for 80 percent of employees and that “[i]n California, the solo medical practitioner is near extinction”].) Others predict that in the near future no more than a handful of health care entities will dominate the managed care industry. (See Kadzielski et al., Credentialing in Managed Care: The New Frontier (1997) 19 Whittier L.Rev. 83, 84 *1072 [noting a forecast by the California Healthcare Association that “by the year 2005, California will have only three to seven dominant provider networks statewide”].) If participation in managed care arrangements is a practical necessity for physicians generally and if only a handful of health care entities have a virtual monopoly on managed care, removing individual physicians from preferred provider networks controlled by these entities could significantly impair those physicians’ practice of medicine.
Here, Potvin alleged that among the adverse effects of removal from MetLife’s preferred provider lists were rejection by “physician groups which were dependent upon credentialling by MetLife” and devastation of his practice, which was reduced to “a small fraction” of his former patients. Proof of these allegations might establish that, in terminating a physician’s preferred provider status, MetLife wields power so substantial as to significantly impair an ordinary, competent physician’s ability to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest.
Loss of income may be relevant in determining whether removal from an insurer’s preferred provider list significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest. Any inquiry regarding the extent of such impairment must be an objective one. Thus, any evidence of Potvin’s loss of income after his expulsion by MetLife, although relevant, would not be conclusive proof that removal from MetLife’s preferred provider lists will generally reduce physician income so significantly as to impair the ability to practice medicine.
Our holding, as described on pages 1070-1071, ante, does not prevent an insurer subject to obligations of common law fair procedure from exercising its sound business judgment when establishing standards for removal of physicians from its preferred provider lists. We simply hold that, under principles recognized by the common law of this state for over a century, such removal must be “both substantively rational and procedurally fair.” (Pinsker II, supra, 12 Cal.3d at p. 550.)
From this limited right to fair procedure, the dissent conjures up the illusion that our decision today “declares that it is the public policy of this state that physicians are entitled to a minimum income.” (Dis. opn., post, at p. 1073.) Nothing in our decision expressly or impliedly says that. As we have explained, the common law right to fair procedure does not apply to an insurer’s removal of a physician from its preferred provider list unless the insurer possesses power so substantial that the removal significantly impairs *1073 the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest. (See ante, at p. 1071.) Even when this common law right does apply, an insurer may remove a physician from its preferred provider list without regard to the financial effect on the physician, so long as the insurer’s decision is “substantively rational and procedurally fair.” (Pinsker II, supra, 12 Cal.3d at p. 550.)
MetLife contends that even if removal of a physician from its preferred provider lists is subject to the common law right to fair procedure, here Potvin waived that right by agreeing that MetLife could terminate the provider arrangement without cause. Potvin responds that the public policy considerations supporting the common law right to fair procedure render the “without cause” clause in the MetLife preferred provider agreement unenforceable.[3] Faced with similar arguments, the New Hampshire Supreme Court declined to enforce a “without cause” provision in a contract between a health maintenance organization and one of its preferred provider physicians, allowing the case to go to trial on the physician’s claim that the summary termination of his provider status violated the contractual obligations of good faith and fair dealing. (Harper v. Healthsource New Hampshire, supra, 674 A.2d at pp. 964-966.) California courts, too, are loathe to enforce contract provisions offensive to public policy. (Kreamer v. Earl (1891) 91 Cal. 112, 117 [27 P. 735] [“ ‘No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication’ ”]; accord, Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 381 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) We therefore agree with Potvin that the “without cause” termination clause is unenforceable to the extent it purports to limit an otherwise existing right to fair procedure under the common law.
Disposition
The judgment of the Court of Appeal is affirmed.
George, C. J., Mosk, J., and Werdegar, J., concurred.

A threshold issue MetLife raised in its petition for review is whether Potvin’s complaint alleged any claim for violation of the common law right to fair procedure. As we have noted *1066 in the text, the first cause of action bore the heading “Violation of Business and Professions Code section 805 et seq. and for Violation of Fair Procedure.” (Italics added.) The body of the complaint alleged: “By removing plaintiff from the defendants’ Provider List, defendants deprived plaintiff of a vested property right without a hearing. It did so in violation of due process of law and by depriving the plaintiff of fair procedure.” (Italics added.) We agree with the Court of Appeal that “despite the inartful pleading,” the complaint does allege a violation of the right to fair procedure.
Because both the trial court and the Court of Appeal rejected Potvin’s claim of entitlement to a hearing under Business and Professions Code section 805, MetLife did not raise that issue in its petition for review. We decline Potvin’s request that we nonetheless consider it in exercising our discretion to hear “any or all issues in the cause.” (Cal. Rules of Court, rule 29.2(a).)

Our decision here does not apply to employer-employee contractual relations. Rather, it applies only to an insurer’s decision to remove individual physicians from its preferred provider lists. We express no view on whether the factors giving rise to the common law right of fair procedure would be present when an insurer, acting to limit its service in a geographic area or medical field, reduces the total number of physicians on its preferred provider lists.

Physicians on defendant MetLife’s preferred provider lists are not its employees. Thus, this case does not raise an issue that is subject to Labor Code section 2922, which states: “An employment, having no specified term, may be terminated at the will of either party on notice to the other.”