[No. B196817. Second Dist., Div. Five. Mar. 25, 2008.]

BOB YARI, Plaintiff and Appellant, v.
PRODUCERS GUILD OF AMERICA, INC., et al., Defendants and
Respondents.

COUNSEL

Nixon Peabody, Roger R. Crane, Thaddeus J. Stauber and Matthew Zandi for Plaintiff and Appellant.

Quinn Emanuel Urquhart Oliver & Hedges, George R. Hedges and David W. Quinto for Defendants and Respondents.

OPINION

ARMSTRONG, J.—Under the *Marinship-Pinsker* line of cases (*James v. Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329]; *Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495] (*Pinsker*)), a private organization's decisionmaking process can, under certain circumstances, be subject to a common law right of fair procedure which includes judicial review. The central question in this case concerns that right.

Plaintiff and appellant Bob Yari contends that the right applies to decisions made by defendants and respondents the Academy of Motion Picture Arts and Sciences (Academy) and the Producers Guild of America, Inc. (Guild), in connection with the Academy Awards. Specifically, he contends that the right applies to defendants' decision that, for purposes of the "Best Picture" award, he was not a producer of Crash (Lions Gate Films 2005), the movie which won that award in 2006.

We find, as did the trial court, that the right of fair procedure does not apply to the decisions private organizations such as these defendants make about their own awards, and also find that Yari did not state a cause of action under any of his remaining theories. We thus affirm the judgment in favor of defendants.

## Facts[1]

The Best Picture award is presented to a movie's producers, and in the past, the Academy presented the award to all producers designated as such on the movie itself. The Academy's rules changed in 2005. Under the new rules, "The individual(s) who shall be credited for Academy Awards purposes must have screen credit as 'producer' or 'produced by.' . . . The nominees will be those with three or fewer producers who have performed the major portion of the producer function. The Producers Branch Executive Committee will designate the qualifying producer nominees for each of the nominated pictures." The executive committee relies on Guild designations. The Guild is not a labor union and its rules are not the result of a collective bargaining agreement, but were created by "a small number of individuals."

Yari, along with five others, received screen credit as a producer of Crash. Crash was nominated for Best Picture, and, in accord with its rules and procedures, the Guild sent an application, an eligibility form, to all six credited producers, asking the applicant to describe his or her responsibility in various areas.[2] The Guild designated two of the other Crash producers as producers, but Yari's application was unsuccessful. He appealed to the Guild, then the Academy, to no avail. He filed this suit. In the second amended complaint at issue here, he brought causes of action for the wrongful denial of the right of fair procedure, breach of fiduciary duty, breach of implied contract, and promissory estoppel.

In brief, he alleged that the Guild and Academy are powerful, quasi-public institutions which control the profession of movie producing, that their decisionmaking processes were arbitrary and unfair, and that under the Guild's and the Academy's own rules, he deserved the credit he was denied. As to damages, he alleged that the Guild's and Academy's decision tarnished his reputation because it amounted to a public statement that he was a "mere 'money man' " who did not perform creative functions on Crash, that if he

---

[1] These facts are taken from the second amended complaint. Pursuant to the well-established rules on appeal we "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context," and treat the demurrer as admitting all material facts properly pleaded. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

[2] The complaint alleges that the forms were sent in connection with the possibility that Crash would be nominated for the Guild's own awards, and further alleges that in fact, Yari did not receive his form from the Guild, but from Crash's distributor, Lions Gate.

had been given the credit, he would have received the "recognition, prestige, financial and professional benefits attained by only the most successful motion picture producers," and that "[h]e has been deprived of each of these things."

He sought injunctive relief prohibiting defendants from making future credit determinations in the current manner and requiring them to modify their credit procedures in several enumerated respects, and money damages.

On defendants' demurrer, the trial court sustained without leave to amend as to the causes of action for breach of fiduciary duty and promissory estoppel, and with leave to amend on the causes of action for denial of the right of fair procedure and breach of implied contract. Yari chose to stand on his complaint, and judgment was entered in defendants' favor.

Discussion

1. *The cause of action under the common law right of fair procedure*

■ This right has its origin in *James v. Marinship Corp., supra,* 25 Cal.2d 721, and was developed in what has come to be called the *Marinship-Pinsker* or *Marinship-Pinsker-Ezekial-Potvin* line of cases. The cases concern exclusion or expulsion from membership in a gatekeeper organization, such as a labor union, and hold that "the right to practice a lawful trade or profession is sufficiently 'fundamental' to require substantial protection against arbitrary administrative interference, either by government [citations] or by a private entity [citation]." (*Ezekial v. Winkley* (1977) 20 Cal.3d 267, 272 [142 Cal.Rptr. 418, 572 P.2d 32].) When the right applies, "the decisionmaking 'must be both substantively rational and procedurally fair.'" (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1066 [95 Cal.Rptr.2d 496, 997 P.2d 1153] (*Potvin*).)

The Supreme Court has explained: "In *Marinship,* we held that a labor union, because of its ability to exclude all nonmembers from employment in a particular trade, assumed legal responsibilities beyond those which were applicable to other private organizations such as social clubs [and] concluded that the union's possession of this power entitled applicants for membership, under the common law, to judicial protection against arbitrary exclusion on the basis of race. [Citation.] Since *Marinship,* California courts, in a variety of circumstances, have recognized the effect which exclusion from member

ship in a private organization exerts upon a person's right to pursue a particular profession or calling. Thus, subsequent California decisions have not only expanded judicial review of labor union membership policies [citations], but also have applied the *Marinship* principle to the admission practices of professional societies, membership in which is practical prerequisite to pursuit of a medical or dental specialty [citations], and to access by practicing physicians to staff privileges in private hospitals [citations]." (*Ezekial v. Winkley, supra*, 20 Cal.3d at pp. 271–272.)

*Ezekial* applied the right of fair procedure to a hospital's expulsion of a resident. (*Ezekial v. Winkley, supra*, 20 Cal.3d at p. 270.) Pinsker was a dentist specializing in orthodontics, rejected from membership in local, regional, and national associations of orthodontists. The court found that membership in those organizations was a "practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty" and that the doctrine applied. (*Pinsker, supra*, 1 Cal.3d at p. 166.) *Potvin* applied the doctrine to a doctor removed from an insurance company's preferred provider list, but cautioned that the holding "does not necessarily mean that every insurer wishing to remove a doctor from one of its preferred provider lists must comply with the common law right to fair procedure. The obligation to do so arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest." (*Potvin, supra*, 22 Cal.4th at pp. 1071–1072.)

■ Thus, the right applies only to private decisions which can effectively deprive an individual of the ability to practice a trade or profession. (*Ezekial v. Winkley, supra*, 20 Cal.3d at p. 273.) This complaint includes many general and conclusory allegations about defendants' influence, authority, and prestige, but does not allege that defendants' decision about Best Picture producer credit have that power.

That is, the complaint alleges that the Guild holds a "virtual monopoly in the specialized field of motion picture producing" and regulates "the profession of motion picture producing" through such things as its "Producer's Code of Credits; its 'Truth in Credits' campaign." It "holds itself out as the regulator of the profession of motion picture producing," and "represents itself as the de facto spokesperson for that profession." It has "superior

bargaining power compared to independent producers and nonmembers," which it takes advantage of "in many ways, most conspicuously in the context of industry awards." There are similar allegations about the Academy. With the Guild, it "effectively determines the conditions under which the profession of motion picture producing will be conducted" and holds itself out as arbiter of who is a true producer of a movie.

Those are generalities, and in the most part focus on defendants' appearance of power, rather than their actual power. What is most important is that, when read as a whole, the complaint also alleges that like the "vast majority of independent film producers," Yari is not a member of the Guild;[3] that he produced Crash and received screen credit as a producer of that movie without any permission or certification from either defendant; that he produced movies after Crash and received screen credit on those movies, again without permission or certification from either defendant; that Crash was a financially and critically successful movie; and that he "has been and continues to be engaged in the profession of motion picture producing." The complaint thus alleged that defendants did *not* control Yari's right to practice the trade or profession of movie producing, and that their negative response to his application for Best Picture producer credit did *not* significantly impair his ability to work.

The complaint alleged that Yari's career would have been enhanced if he had received Academy Award credit as a producer, and that his reputation was tarnished because he was not granted that credit, but that is not the same as saying these defendants controlled his ability to work. Clearly, they did not.

Yari repeatedly characterizes this as a "certification case," not an "awards case," at least impliedly conceding that the Academy's choice of the Best Picture of the year is not subject to the right of fair procedure, but is instead entirely within the Academy's purview. We find this case analytically indistinguishable from a challenge to the choice of the movie or actor or writer which will receive an Academy Award. Defendants do not "certify" anyone as a producer in the *Marinship-Pinsker* sense of the term. They do not determine who can work. All defendants did was decide whether Yari met their criteria for receiving one of their awards. There is no judicial review of that decision, even if the winner will benefit from receiving the award, and the losing nominees will suffer by comparison. (See *Kim v. Southern Sierra Council Boy Scouts of America* (2004) 117 Cal.App.4th 743 [11 Cal.Rptr.3d 911] [Boy Scouts's decision to deny Eagle Scout rank not subject to right of fair procedure]; *Blatt v. University of So. California* (1970) 5 Cal.App.3d 935 [85 Cal.Rptr. 601] [right does not apply to application for membership in Order

---

[3] Other documents in the record indicate that he is not a member of the Academy.

of the Coif]; *King v. Regents of University of California* (1982) 138 Cal.App.3d 812, 817 [189 Cal.Rptr. 189] [no right to fair procedure in university's tenure decision].)

In a further attempt to bring this case under the *Marinship*, etc. doctrine, the complaint includes two other kinds of factual allegations. First, the cases include language to the effect that the doctrine is applied in "situations with substantial economic ramifications." (*Ezekial v. Winkley, supra,* 20 Cal.3d at p. 272.) Yari pleads that denial of the producer credit award had such ramifications. However, no case holds that the doctrine applies to all private decisions which have economic ramifications for an individual, and it is quickly apparent that economic ramifications are not enough. Otherwise, a wide variety of awards and honors decisions would be subject to judicial scrutiny.

Next, Yari attempts to plead that defendants are quasi-public institutions, which operate in the public interest. This is based on the following language: "The private organizations in our *Marinship-Pinsker-Ezekial* cases . . . all shared an attribute of significance in our determination that they were subject to the common law right to fair procedure. Each one was a private entity affecting the public interest. As has been recognized: '[C]ertain institutions and enterprises are viewed by the courts as quasi-public in nature: The important products or services which these enterprises provide, their express or implied representations to the public concerning their products or services, their superior bargaining power, legislative recognition of their public aspect, or a combination of these factors, lead courts to impose on these enterprises obligations to the public and the individuals with whom they deal, reflecting the role which they have assumed, apart from and in some cases despite the existence of a contract.' (Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* [(1967)] 55 Cal. L.Rev. [1247,] 1253, fns. omitted.)" (*Potvin, supra,* 22 Cal.4th at p. 1070.)

*Potvin* does not hold that all decisions by such quasi-public entities are subject to the right of fair proceedings, and, at any rate, Yari's allegations do not establish that defendants are such entities. On this point, the complaint alleges that the Guild and the Academy hold themselves out as the ultimate arbiters of "Truth in Credit," and have touted the prestige and fairness of their awards, creating "an enormous public interest" in their functioning. Further, the complaint alleges that "The Academy provides numerous important public services to the public, beginning with its Awards, which it holds out to the public as the most significant and most prestigious in the American motion picture industry, if not the entire world." Other public services include the Academy library, and its efforts to foster cooperation among "creative leaders," and to set technical standards for the industry.

These allegations do not describe the public interest that mattered in *Potvin* and the other cases. For instance, in *Salkin v. California Dental Assn.* (1986) 176 Cal.App.3d 1118 [224 Cal.Rptr. 352], on which Yari relies, state and national dental associations disciplined a member with public censure, after a peer review committee faulted his treatment of two patients. The court found that the organizations were " 'tinged with public stature or purpose' " and that the discipline they meted out "carr[ied] the odor of public sanctions." (*Id.* at p. 1125.)

As Yari argues, the movie industry is an important industry, and movies may affect the ways in which people view the world. Yet, we do not believe that we disparage defendants when we draw a distinction between a medical organization's public representation that one of its members erred in his treatment of patients—a matter outside the expertise of most patients and potential patients—and defendants' awards, which announce themselves as subjective determinations of merit. It is surely true that, as Yari argues, the public is interested in the motion picture industry. That does not mean that industry-related organizations like defendants operate in the public interest.

Yari's argument under *Salkin* is that the denial of credit was the equivalent of public censure because it branded him as having misrepresented himself as a producer of Crash and "stripped him of his credit." The argument is not supported by even the most generous reading of the complaint. Defendants did nothing to Yari's screen credit on Crash,[4] and the awards designations are not disciplinary proceedings, making this case unlike *Salkin* in any meaningful respect. We echo *Kim v. Southern Sierra Council Boy Scouts of America*'s comment about that plaintiff's complaint that he was wrongly denied Eagle Scout rank: "We perceive no reason why existing law should be expanded to provide relief for the speculative type of detriment that allegedly is caused by the absence of the prestige and honor associated with a specific rank in or award . . . ." (*Kim v. Southern Sierra Council Boy Scouts of America, supra*, 117 Cal.App.4th at p. 748.)

## 2. *The cause of action for breach of fiduciary duty*

Yari argues that defendants had such a duty "while making certification decisions about producers of motion pictures." Factually, he relies on the allegations that defendants "effectively determine the conditions under which the profession of motion picture producing will be conducted," and that they "are quasi-public and uniquely influential organizations that hold themselves

---

[4] The Guild's rules, attached to the complaint, provide that "These rules provide a comprehensive overview of the standards and processes utilized by the Producers Guild of America in determining *eligibility for producing honors* . . ." not eligibility for producing *credit.*

out as the sole organizations to determine standards in their respective industries . . . ." Legally, Yari finds a fiduciary duty in *Potvin* and *Pinsker,* which refer to a quasi-public agency's "fiduciary responsibility with respect to the acceptance or rejection of membership applications." (*Pinsker, supra,* 1 Cal.3d at p. 166; see *Potvin, supra,* 22 Cal.4th at p. 1068.)

As we have already found, Yari's "certification" argument fails because the complaint does not allege that defendants "certify" producers, and his "quasi-public" argument fails because the complaint establishes that defendants' role is not quasi-public. His argument that defendants determine the conditions under which motion picture producing is practiced is contradicted by his own career, as it is set forth in the complaint. Similarly, we cannot see that conclusory allegations that defendants represent themselves as setters of standards gives rise to a fiduciary duty.

Yari's reliance on *Potvin* and *Pinsker* reveals that this cause of action is duplicative to the cause of action for denial of the right of fair procedure. It fails for the same reasons that cause of action fails.

### 3. *The causes of action for breach of implied contract and promissory estoppel*

In the implied contract cause of action, Yari pled that in exchange for his participation in the eligibility process, that is, his application to the Guild and appeal to the Academy, defendants agreed to follow their own rules and procedures, and that a binding contract was thus created. Consideration included his efforts in connection with the application and appeal, and the prestige his participation conferred on defendants.[5]

The factual allegations on the promissory estoppel cause of action are similar: Defendants promised to follow their own rules and to make a fair determination in an "objectively reasonable manner." Yari relied on those promises when he allowed Crash to be submitted for the awards, and when he expended "time and effort to comply with their rules and respond to their requests."

---

[5] Yari also pled that after the Guild granted the credit to other producers and denied it to him, he advised the Guild that he and his production company might withdraw the movie. The Guild responded that he could not withdraw the movie. Yari pled that this indicated that the Guild believed that a binding contract had been formed, and advances that argument on appeal. We ignore the allegations of a complaint if they are conclusions of law (*Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499 [193 Cal.Rptr. 377]), and do not find the conclusion supported by logic, or the record. Nothing in the complaint establishes that the other producers of Crash could not have submitted the movie for an award, or indeed that the Academy could not have given the movie an award over the objections of its producers.

A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct. (*Chandler v. Roach* (1957) 156 Cal.App.2d 435, 440 [319 P.2d 776].) A cause of action for promissory estoppel is "basically the same as contract actions, but only missing the consideration element." (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 903 [28 Cal.Rptr.3d 894].)

We cannot see that these allegations sufficiently plead either contract or estoppel. As to both causes of action, Yari is essentially asserting that an application for an award creates a contract, at least if the awarding body has rules and represents that it follows them. A contract can arise from a contest entry (see *Brown v. State* (1999) 230 Wis.2d 355 [602 N.W.2d 79, 88] and the cases collected therein [relationship between state lottery agency and lottery ticket buyer is contractual]), but the application described here is not a contest application.

*Cinemateca Uruguaya v. Academy of Motion Picture* (C.D.Cal. 1993) 826 F.Supp. 323 is instructive. In that case, the plaintiffs' movie was nominated for the award for "Best Foreign Language Film," but the Academy later revoked the nomination, on information that the movie was not, after all, eligible in the category. The plaintiffs sought an injunction against revocation of the nomination, but the court found that because there was no contract, they were unlikely to succeed on the merits, holding that "an Oscar is an award and not a contest where a contract arises between contest entrants and the sponsor. An award is retrospective in nature. While contests compel a particular act from the contestant, an award or nomination for an award (i.e., the Oscar) recognizes an achievement (i.e., a film) that was accomplished not for a contest, but for independent reasons. Courts have recognized that contracts arise between contest entrants and sponsors, but 'the case [is] different if an award [is] made in recognition of past achievements . . . out of affection, respect, admiration, charity or like impulses.' *Robertson v. United States,* 343 U.S. 711, 713, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952)." (*Cinemateca Uruguaya, supra,* at p. 325.)

Here, too, Yari's application for an award did not create a contract, or a promise on which reliance was reasonable. Once again, to rule otherwise would be to rule that defendants' awards are subject to judicial review.

## Disposition

The judgment is affirmed. Respondents to recover costs on appeal.

Turner, P. J., and Kriegler, J., concurred.