Filed 6/13/13  Roger v. CorVel Healthcare CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOUGLAS J. ROGER, | |
| Plaintiff and Appellant, | G045935 |
| v. | (Super. Ct. No. 07CC11570) |
| CORVEL HEALTHCARE CORPORATION, | ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Respondent. | |

The opinion filed May 16, 2013 is hereby modified in the following particulars:

(1)  On page 4, of the opinion remove the "A." of subheading and replace with "1." so it now reads "1. *The main agreement*."

(2)  On page 5, of the opinion remove the "B." of subheading and replace with "2." so it now reads "2. *The provider agreement*."

(3)  On page 6, of the opinion remove the "C." of subheading and replace with "3." so it now reads "3. *The utilization review agreement*."

(4)  On page 7, of the opinion remove the "D." of subheading and replace with "4." so it now reads "4.  *The appeal agreement*."

(5)  On page 21, of the opinion, at the end of the first full paragraph, (currently ending with the words "precise procedure specified in CorVel's contract") insert this citation:  (*El-Attar v. Hollywood Presbyterian Medical Center* (June 6, 2013, S196830) ___ Cal.4th ___, ___ [2013 Cal. Lexis 4697, at p. *19]["In applying the common law doctrine of fair procedure, we have long recognized that departures from an organization's procedural rules will be disregarded unless they have produced some injustice."].)

These modifications do not effect the judgment.

The petition for rehearing is DENIED.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

2

Filed 5/16/13 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DOUGLAS J. ROGER, | |
| Plaintiff and Appellant, | G045935 |
| v. | (Super. Ct. No. 07CC11570) |
| CORVEL HEALTHCARE CORPORATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge. Affirmed.

Law Office of Don C. Burns and Don C. Burns for Plaintiff and Appellant.

Sedgwick LLP, Gary S. Pancer, Robert C. Bohner and Douglas J. Collodel for Defendant and Respondent.

\*          \*          \*

# I. INTRODUCTION

A workers' compensation system medical provider network terminated the contract of an orthopedic surgeon for two separate, albeit interrelated, reasons: First, he was unreachable by independent reviewing physicians hired by the network to evaluate four nonstandard treatments he was regularly prescribing for his workers' compensation patients. Second, he was prescribing those nonstandard treatments on a wholesale basis, and not taking the time to justify their application to *particular* patients. As we show below, the medical provider network was well within its rights in terminating his contract.

The case becomes more complicated, though, when one realizes that the medical provider network did not comply with the letter of the contract as regards the *process* of termination. The contract clearly provided for a graduated, three-step disciplinary process based on first, second, and third offenses: first a warning letter, second a set of counseling "sessions," and only then, third, actual termination. And that didn't happen. The network terminated the physician after one lengthy telephone discussion with one independent reviewing physician about one patient.

Despite this, we affirm the judgment the orthopedic surgeon take nothing by this breach of contract action. The physician sustained no damage *as a result of* the network's failure to follow the three-step procedure. The record is clear the physician was not about to change his practice to conform to the network's utilization review procedure, either by making himself readily accessible for peer review consultations, or by taking the time and effort to justify his nonstandard treatments on a patient-specific basis. Under those circumstances, there was no causal connection between the absence of the three-step process and the physician's ultimate termination from the network. Like one of T.S. Eliot's famous cats, the physician was going to do "as he do do, and there's no doing anything about it." (T.S. Eliot, Old Possum's Book of Practical Cats (1982) pp. 13-14.)

## II. FACTS

The appellant physician did not request a formal statement of decision, so *all* conflicts in the evidence, and any reasonable inferences to be drawn from any substantial evidence must be drawn in the network's favor.[1]  The point is important because, as much as we might agree with the appellant physician in this opinion on various individual arguments made in this appeal, the evidence is susceptible of the reasonable inference that the physician would *never* modify his practice to conform to the contract.  And it is that inference which ultimately sinks his case and requires affirmance of the judgment.

A.  *The Network and Dr. Roger*

Plaintiff, Dr. Douglas J. Roger, is a board certified orthopedic surgeon who has published peer-reviewed articles in a variety of orthopedic journals. He has presented research before a variety of orthopedic physician groups, and has taught orthopedic surgery at Stanford.  There is not a hint of a whisper in this record that he is anything less than an extremely competent orthopedic physician, and we stress at the outset that his termination had nothing to do with any adverse patient "outcomes."

The defendant, CorVel Healthcare, is a little harder to describe.  In a word, it is a "medical provider network" (often acronymized to MPN in the briefing) which provides medical treatment for injuries covered by the workers' compensation laws.

Under the 2004 reforms to California's workers' compensation laws, all employers must institute a "utilization review" process for their workers' compensation

---

[1]      The reply brief asserts that at an unrecorded meeting in chambers with the judge on the third day of trial, the physician's trial counsel said, "This might be a good time to ask that we get a written decision, per 632." Even if made, that observation by counsel was inadequate to trigger any obligation on the trial court's part to prepare a formal statement of decision.  It was not a request, and it didn't comply with section 632 of the Code of Civil Procedure.  ("The request must be made within 10 days *after* the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision.  The request for a statement of decision *shall specify those controverted issues* as to which the party is requesting a statement of decision." (Italics added.))

5

program.  (See Lab. Code, § 4610, subd. (b).[2])  As part of those 2004 reforms, employers and workers' compensation insurers can contract with a medical provider network, like CorVel, for medical services and concomitant utilization review.  (See § 4616.)

B. *The Contract*

In 2006, one of CorVel's clients, Ralph's supermarkets, requested Dr. Roger be added to CorVel's network of workers' compensation physicians.  Deanna Kaufman, a CorVel contract specialist, signed Dr. Roger up.

In broad terms, CorVel agreed to market Dr. Roger's services as a participating provider by listing him in its network, and it promised to expedite payments to him.  In return, Dr. Roger agreed to accept a reduction in his fees of about 20 percent and otherwise abide by CorVel's rules.

The contract itself was organized into two basic parts.  First was the main agreement, called "CorCare Preferred Provider Organization Agreement."

The second part, attached to the main agreement as Exhibit A, consisted of three documents which bear on this appeal:  (1) the "CorVel HealthCare Organization (HCO) Provider Agreement," (the "provider agreement"); (2) a document entitled "CorVel Healthcare Organization Quality and Utilization Management Programs" (the "utilization review agreement"); and (3) the "CorVel HealthCare Organization Peer Review, Grievance and Appeal Procedures" (the "appeal agreement").

A. *The main agreement*

Several provisions of the main agreement are important to the resolution of this case.  Early on in the main agreement, in section 2.2, is a very clear statement that the physician retains the right to exercise his or her independent judgment in treating patients.

---

[2]  All further statutory references are to the Labor Code unless otherwise indicated.

Then comes utilization review. In section 3.8, the physician agrees to "participate in, cooperate with, and abide by all policies, procedures, and directives of Payors' [employers who are clients of CorVel's], CorVel's or CorVel's designee's utilization management and quality assurance programs and to cooperate with Payors', CorVel's or CorVel's designee's requests for information, records, reports, files, data, or documentation of services provided in performing such functions."

Termination is the subject of section 6 in the main agreement. Three kinds of termination are specified in three separate sections: Section 6.2, for termination without cause, upon 90 days written notice by either party;[3] section 6.3, for termination with cause, based on some failing of the physician that jeopardizes actual patient care (e.g., loss of hospital staff privileges, felony conviction, conduct endangering the "health welfare or safety" of a beneficiary); and section 6.4, for termination based on material breaches of the agreement itself. An important aspect of section 6.4 is that, while it contemplates an opportunity to cure the breach before termination, any cure must be to the *satisfaction* of the nonbreaching party.[4]

### B. *The provider agreement*

The provider agreement, which is specifically tailored to workers' compensation, has a number of noteworthy provisions as well. As with the main agreement, there is a provision, section 2.1, which leaves the independent judgment of

---

3    One might wonder why Dr. Roger would bother to sue if he could have been terminated "without cause" on 90 days written notice anyway. The answer appears to lie in *Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060. In *Potvin*, a doctor was delisted from a preferred provider network or PPO, and the contract allowed termination "'without cause.'" (*Id.* at p. 1064.) That didn't help the PPO, because the doctor still had a cause of action for violation of the common law right of fair procedure. (See *id*. at pp. 1072-1073.) Accordingly, in the case before us, CorVel makes no reliance on section 6.2, the termination-without-cause provision of the main agreement.

4    "6.4 <u>Termination Due to Material Breach</u>. Termination may be effected for breach of Agreement or default in the performance of any provision herein if such breach is not corrected to the reasonable satisfaction of the nonbreaching party within thirty (30) days of receipt of written notice of the breach from the nonbreaching party. All terms and provisions of this Agreement shall remain in effect until the effective date of termination."

7

the physician inviolate.[5]  Moreover, section 2.1 states the "standards" of the physician's practice are to be the same for the physician's workers' compensation patients as they are for the physician's other patients.  The provision thus implies the physician – regardless of whatever constraints on treatment the workers' compensation system might impose – should treat patients the same, regardless of whether they incurred a weekend warrior sports injury, or a full-blown occupational injury covered by workers' compensation.

Article 5 of the exhibit A provider agreement addressed the need to comply with CorVel's utilization management system.  Physicians must "cooperate fully" with CorVel's management and utilization program, including its peer review and appeal processes.[6]  And another provision of the provider agreement stated that upon written request of either party, the two parties would "meet and confer in good faith to resolve any disputes or problems that may arise under this agreement."[7]

C.  *The utilization review agreement*

There are two relevant sections of the utilization review agreement:  Under the heading of elements of utilization management there is a section C4, for denials, which expressly contemplates the possibility of documentation of *denials* of service *by CorVel*, and the opportunity for the physician to appeal any denial through CorVel's

---

[5]  "Provider shall provide Workers' Compensation Health Care Services to Employees within the scope of Provider's practice, in the same manner and in accordance with the same standards as health care services are provided to other patients of Provider.  Nothing herein shall be construed to require Provider to take any action inconsistent with Provider's professional judgment concerning the medical care and treatment to be rendered to Employees."

[6]  "5.1 Quality Utilization Management.  Provider shall cooperate with the provisions of Section 9792.6 of the Code *and shall cooperate fully with Corvel's Quality and Utilization Management Programs, including its appeals process*, established pursuant to Section 9292.6 of the Code as such Quality and Utilization Management Programs may be amended from time to time, and as described in this agreement.  [¶]  5.2 Peer Review, Grievance and Appeal.  Provider agrees to *cooperate fully with CorVel's peer review, grievance and appeal procedures*, as such peer review, grievance and appeal procedures may be amended from time to time and as described in this Agreement.  Provider shall not discriminate against an Employee solely on the grounds that such Employee filed a grievance against Provider."  (Italics added.)

[7]  The provider agreement also has a termination section in article 7, but that section is only devoted to the aftermath of a termination, and its basic purpose is to assure a smooth transition from a terminated provider to another.

formal appeal procedures "described in this agreement," i.e., presumably meaning the specific appeal agreement.

There is also a section D, which spells out the three-step discipline procedure to which we have already referred. We quote the entire section in the margin, but for the moment we should note there is no way to read the section fairly without coming to the conclusion that a putatively errant physician first receives a formal letter stating a "problem," *after* that is required to "participate" in "education and counseling" sessions conducted by CorVel administrative staff, and only *then* is subject to suspension or termination.[8]

### D. *The appeal agreement*

The appeal agreement provides that if a physician disputes a denial of service based on "medical necessity/appropriateness," the physician can file a grievance in writing or call a toll-free phone number, and the information will be forwarded to CorVel's own "Customer Service Advocate," who is to investigate and try to achieve an "informal resolution of the grievance." If no informal resolution is achieved, the physician can initiate a "Level Two appeal" that goes to CorVel's department manager and then to CorVel's utilization management committee, who decides whether to "uphold" the customer service advocate's "original proposed resolution" of the dispute.

---

[8] "CorVel will seek to improve individual and system performance through education, counseling and other feedback as conducted by CorVel's administrative staff, its Medical Director and its QA/UM Committees. Perceived problems with providers not corrected by these actions will be reviewed by the Credentialing Committee and Board of Directors. Frequent utilization and/or billing problems may require more stringent monitoring or other restrictions. The following disciplinary process will be used:

"1. <u>FIRST OFFENSE</u>. A letter from the Medical Director or designee stating details of the problem and correction to be taken.

"2. <u>SECOND OFFENSE</u>. The provider will be required to participate in education and counseling sessions conducted by the CorVel administrative staff, the Medical Director and the QA/UM Committees.

"3. <u>THIRD OFFENSE</u>. Suspension or termination of the provider from the CorVel network or other administrative action determined by the Board of Directors in accordance with the Provider Agreement."

9

C. *The Four Nonstandard Treatments*

Dr. Roger regularly prescribed four nonstandard treatments for his workers' compensation patients. The first is known as a "surface EMG" – the EMG standing for electromyography. Electromyography is a process of trying to record muscle activity. It can be done by needle, which is considered a separate procedure from surface EMGs, or it can be done by surface electrodes—hence the term "surface EMGs." Thus it is technically classified as a diagnostic "test" as distinct from a "treatment." Even so, for the sake of readability, we will classify it as a "treatment" for purposes of this opinion.[9]

Surface EMG's are controversial. Insurers, generally speaking, don't like them. (E.g., *State Farm Mutual Auto. Ins. Co. v. Pain & Injury Rehabilitation Clinic* (June 8, 2009, E.D. Mich.) 2009 WL 1587371 [noting it was "unclear" whether surface EMG device met nationally recognized standards and there was "serious doubt" on its clinical value].) But it has not been without success in the courts. The Florida Court of Appeal upheld an administrative law judge's finding "that surface EMG testing has significant medical value as a diagnostic tool with respect to the treatment of a patient suffering from injuries like those arising out of a motor vehicle accident," noting the finding was "supported by competent substantial evidence." (*Department of Health v. Merritt* (Fla. App. 2006) 919 So.2d 561, 564.)

The other nonstandard treatments were two ointments and one "medical food." The two ointments were a capsaicin compound referred to by the parties as wasabi-rub, the other a compound of various ingredients called Gaba-2K rub. The "medical food" was theramine tablets. A "medical food" is a specially made food for seriously ill patients which must be used under a physician's supervision.

---

[9]     The other nonstandard treatments are actual treatments, as distinct from tests. But for lack of a term that encompasses both treatments and tests in lay terms, we will refer to surface EMG's as treatments. Accordingly, when we collectively describe the four items which CorVel did not want to approve as "treatments," it is with the recognition that surface EMGs are better classified as tests.

Dr. Roger does not dispute that *none* of these four treatments are recommended for use in the medical treatment utilization schedule (MTUS) adopted by California Division of Workers' Compensation.[10]  On the other hand, CorVel adduced no evidence that any of them cause actual harm to patients.[11]

D.  *Dr. Rogers' Treatment Pattern*

Dr. Roger is professionally convinced of the general efficacy, safety and advisability of each of the four nonstandard treatments.  He prescribed them over 90 times, either individually or in some combination, over the course of the year following his sign-up with CorVel.

Under CorVel's procedures – indeed, under the Labor Code itself – non-doctors do not have the unilateral authority to do anything other than approve a requested treatment.  (See § 4610, subd. (e).)  Thus each time Dr. Roger prescribed one of the nonstandard treatments, section C4 of the utilization review agreement required the request to be forwarded by CorVel to an independent reviewing physician.  And in each of those more than 90 cases, the proposed treatment was not "certified" for payment, as stated in a memo.  Dr. Roger now denigrates the non-certification memos as "cut and

---

[10]     Interestingly enough, no actual copy of the MTUS is to be found in our appellate record.  The only evidence to the effect that each of the nonstandard treatments is not approved under MTUS is indirect, via testimony and the various rejection letters authored by independent reviewing physicians.

The two ointments and the food are included in a number of treatments considered in a January 2011 Rand Corporation paper for the Institute for Civil Justice.  (See Wynn, *Use of Compound Drugs, Medical Foods, and Co-Packs in California's Workers' Compensation Program* (January 2011) P-828-ICJ (hereinafter Rand Paper).  The author argues that California's MTUS should "address" such compound drugs and medical foods.  (*Id*. at pp. 28-29.)

[11]     First, do no harm.  The closest CorVel comes to arguing that one of the four treatments causes actual harm is to cite the testimony of one of its experts on redirect examination, Dr. Clive Segil, an orthopedic surgeon and scoliosis expert, who opined that surface EMGs could, "from an indirect point of view," present a risk of harm to a patient because "a physician or a surgeon would rely on that information and do maybe an unnecessary procedure or operation."

Dr. Segil's testimony does not rise to the level of substantial evidence that surface EMGs cause harm.  He testified that the surface EMG is an "unreliable, nonspecific test," but he couldn't recall where he read that conclusion, and he had never seen a surface EMG test performed or demonstrated.  More importantly, in the day and age of managed care, it borders on the ludicrous to suppose that any surgeon would undertake – or be allowed to undertake – any surgery on a workers' compensation patient *solely* based on the results of a surface EMG test.  This digression is important because CorVel invoked the wrong provision of the main agreement – section 6.3 bearing on possible jeopardization of patient health instead of section 6.4 bearing on breach of the agreement itself – in its termination letter.

paste jobs" performed by nurses rather than actual doctors (even though they were *signed* by doctors), but cites no evidence to that effect. On appeal, of course, we must assume otherwise. There are exhibits and testimony to the effect that a number of the independent reviewing physicians *personally* tried to call Dr. Roger to discuss his prescription of the one or more of the nonstandard treatments.

But Dr. Roger made himself practically unreachable during his tenure with CorVel. He testified he operated four offices during this period, and he had a personal policy of never returning any phone call from an independent reviewing physician unless he was at the office where the patient's file was kept. Moreover, he was not available after hours for discussion, because of the same need for the patient's file. And beyond that, he believed he had no obligation to return any call from an independent reviewing physician unless that physician *explicitly* requested a call back. Not surprisingly then, the record contains ample evidence from independent reviewing physicians that Dr. Roger failed to return (by our count) no less than 10 calls from independent reviewing physicians. Moreover, Dr. Roger had no office email, so it is also not surprising the record contains no email correspondence between Dr. Roger and a reviewing physician about any given patient.

Even *worse* – and "worse" is the precise word the trial judge used for it – Dr. Roger resorted to the unethical practice of upcoding in order to be paid for the surface EMGs he prescribed.[12] There is substantial evidence in this record that Dr. Roger's office submitted bills using the standard medical billing code for *needle* EMGs (which *is*

---

[12] The trial judge filed a minute order delivering his decision in favor of CorVel. That minute order is not to be confused with a formal statement of decision – most conspicuously it did not touch on the problem of the *process* due Dr. Roger at all. But it did make a point about the upcoding: "It is understandable that a highly-educated physician might be frustrated with rules and regulations imposed upon his profession and limiting his discretion. Unfortunately, that annoyance led to outright disregard of the governing guidelines and, *worse*, to efforts to subvert them." The judge went to say that to minimize the risk of nonpayment, Dr. Roger used "deceptive billing codes for the surface EMGs [that] might not be detected by Corvel." (Italics added.)

an approved test under MTUS), when the actual procedures he performed were *surface EMGs*.[13]

E. *The Termination Process*

Since Dr. Roger's appeal, at its most basic, centers on the adequacy of the process he received from CorVel leading to his termination, we recount the events of the Roger-CorVel relationship in the period June 2007 through October 2007 in some detail. CorVel perceived a problem in Dr. Roger's habit of prescribing treatments not approved by MTUS and then simply ignoring the attempts of independent reviewing physicians to discuss the prescription with him. And so, on June 7, 2007, CorVel's Deanna Kaufman sent him a termination letter.

Kaufman requested a "formal response" to certain "grievances," but preceded their enumeration by asserting Dr. Roger's "practice is repeatedly failing to adhere to the UR guidelines set by the CorVel Corporation." The letter then stated that "individual responses" were required for four particular patients, and pointed out that Dr. Roger had made "no response" to peer review requests concerning those patients. The letter then stated that due to these "multiple instances notated above," CorVel had decided to exercise its right to terminate the contract "pursuant to Section 6.3," but Dr.

---

[13] Douglas Marx, Dr. Roger's office manager, admitted that "100 percent of the bills that went out from Dr. Roger for surface EMG were billed as needle EMG under the workers' comp code." And an employee of the company that did Dr. Roger's billing later testified that codes for needle EMGs were deliberately used to get paid for surface EMGs:

"Q. Did you submit medical records for all of the billings that were billed under needle for Dr. Roger?

"A. Yes, we did.

"Q. Every single one?

"A. For every needle EMG that was reported, there is a different report for the needle EMGs, not the same report for the surface EMGs.

"Q. Did Dr. Roger perform needle EMGs, to your knowledge?

"A. *He did not.*

"Q. So for surface EMGs he performed, you billed it as needle; yes?

"A. Not – we did not. *The code reflected needle. But we knew – because it was not covered, that was the code that*" we used to make sure that we were paid." (Italics added.)

While the upcoding was *not* one of the reasons CorVel terminated Dr. Roger, the issue is still significant because it plays a role in why we ultimately affirm the trial court's judgment. Not to put too fine a point on it, if Dr. Roger was willing to resort to dishonest practices to get paid for surface EMGs, the trial judge could reasonably conclude he would *never* reform sufficient to comply with CorVel's contract.

13

Roger had 30 days to "respond and resolve the above disputes." If not, his contract would be terminated effective July 6, 2007. The letter made no reference to termination based on any section other than 6.3, which, as we noted above, only applies to some event evidencing jeopardization of actual patient health. In its briefing on appeal, CorVel candidly concedes it forgot to include section 6.4 – termination for breach of the contract as distinct from jeopardization of patient care. Nor does the letter make any explicit reference to terminating Dr. Roger because of some propensity to prescribe nonstandard treatments; the only specific derelictions mentioned are failure to respond to peer review requests.

The letter was faxed, so it generated an almost immediate phone call from Douglas Marx, Dr. Roger's main office manager. Kaufman would later testify that she told Marx Dr. Roger needed to "be available for a peer-to-peer." Marx told her in that conversation he was "well aware of the issues," which included the fact there had been "an excessive number of non-certifications."

The letter also finally prompted Dr. Roger to talk to an independent reviewing physician, Dr. Robert Holladay, on July 6, 2007, by phone. The conference with Dr. Holladay was not, however, about Dr. Roger's practice generally, but about a specific patient, whom we simply identify as Marcela. Dr. Roger had prescribed for Marcela all four nonstandard treatments, so the conference afforded Dr. Roger the opportunity to cite to Dr. Holladay much of the professional literature supporting the four nonstandard treatments.

Neither physician budged. Dr. Holladay was unimpressed with Dr. Roger's arguments for the nonstandard treatments. For his part, Dr. Roger simply said the two had a "difference of opinion."

Deanna Kaufman was quite hopeful the Holladay conference would correct (from CorVel's point of view) Dr. Roger's noncompliance with the contract. On the day of the conference she wrote to Douglas Marx to extend the July 7 deadline for

14

termination as indicated in the June 6 letter to July 20. But Kaufman's hopes were dashed when CorVel received Dr. Holladay's written report of the conference. Dr. Holladay's report said Dr. Roger had not agreed to any change in his prescriptions for Marcela.

Somehow, the July 20 deadline came and went without formal notice of termination to Dr. Roger; the actual communication of termination came in an email four days later from Kaufman to Marx. The email was general, mentioning only "grievances" that "still have not been resolved to satisfaction," but not spelling them out. It did say, though, "we will be terminating Dr. Roger from the Corvel MPN network effective July 20th, 2007" and a "formal letter for your file will be going out in the mail today."

No formal letter of termination, however – at least none dated July 24 – appears in our record. In fact, the final termination letter would not be sent for about two months. For her part, Kaufman appears to have been thinking at that point Dr. Roger would appeal the termination.

He didn't. He did, however, write a formal protest letter to Kaufman August 30, 2007. Among other things, he asserted he'd been removed "without any explanation for said removal," had not "received formal notification" of his termination, argued he had treated "in strict compliance with the ACOEM guidelines and the California labor code,"[14] and generally asserted a violation of due process.

Kaufman wrote back on September 17, to reiterate that "the issues that surrounded the initial submission of a grievance originally filed on June 7, 2007, have not been successfully resolved" – again she did not specify precisely what those

---

[14]     ACOEM stands for American College of Occupation Medicine. After the 2004 reforms, its guidelines served as the interim rules of utilization review until they were formally adopted in the MTUS. The subject of the applicability of ACOEM guidelines in the immediate aftermath of the 2004 workers' compensation reforms is covered in *Sierra Pacific Industries v. Workers' Comp. Appeals Bd.* (2006) 140 Cal.App.4th 1498, which held the ACOEM guidelines should take effect as of date of reforms, even if the injury occurred before.

"issues" were – "so CorVel has decided to terminate your participation within our MPN network effective July 20th, 2007."

The September 17 letter appears to have generated a final attempt to achieve some informal resolution of CorVel's dispute with Dr. Roger in the form of a four-way telephone conference held October 12. Kaufman was not hopeful going into that conference. She had had "pushback" from Marx to the effect Dr. Roger really "believed in the certifications [that is, treatments] that he was requesting." But Garcia, at least, emerged from the conference optimistic. She was "quite pleased" with the outcome; she felt "there was a better understanding of what the obligations that were needed – that [Dr. Roger] would need to follow in order to reinstatement him." Everybody, she thought, was now "on the same page." According to Garcia, Roger had said "he would be willing to adhere to the guidelines" and provide "a telephone number in order to successfully be able to schedule peer-to-peer discussions" Indeed, she thought that Dr. Roger's nonstandard treatment requests "would discontinue." CorVel's optimistic understanding was memorialized in a letter sent to Dr. Roger on October 12.

CorVel's hopes of a reconciliation died when it received a letter from Dr. Roger dated October 15. To be sure, Dr. Roger stated his "absolute intention to comply with the UR and QA processes which are outlined in the CorVel Provider Agreement." But he stepped back from the purported understanding of a direct phone number, basically saying he was too busy to take calls during normal office hours. More ominously (from CorVel's point of view), Dr. Roger remained adamant about his intent to continue with the four nonstandard treatments. ("Any action by a physician to put cost containing measures above the best interests of the patient constitutes an ethical violation of the highest level.")

And with that, all hope of reconciliation was abandoned. Dr. Roger filed this litigation the next month, alleging, among other things, breach of contract. While many of his other causes of action fell to the wayside in pretrial challenges, his breach of

16

contract cause of action survived to trial, where it was heard by a judge. By the time of trial, the percentage of his practice devoted to workers' compensation, which had been at about 90 percent, had dropped to some 30 to 40 percent.

As we have noted, there was no statement of decision, only a minute order. While the judge sympathized with Dr. Roger about the constraints imposed on him by CorVel's utilization review process, as noted, the judge was explicitly unimpressed by Dr. Roger's practice of upcoding. The bottom line was that Dr. Roger "had little interest in compliance with the guidelines that followed the 2004 reforms."

### III. DISCUSSION

A. *Grounds for Termination*

Dr. Roger does not really contest the proposition he violated his contract with CorVel requiring him to "fully" comply with its utilization management program by his habit of making himself incommunicado with independent reviewing physicians. He argues, rather, that CorVel's grievances regarding communication were only pretexts for its *real* reason for wanting him terminated, which was that his prescription of nonstandard treatments made extra work for CorVel, discrepant with its own preoccupation with reducing costs.

It is a sufficient answer to this point that substantial evidence shows CorVel's concern over communication was not pretextual, but went to the essence of its utilization review system. The 2004 workers' compensation reforms are not as inflexible as Dr. Roger would have us believe, but part of that flexibility requires physicians to be in relatively prompt and constant communication when they prescribe nonstandard treatments. Kaufman's letter of June 6, her conversation with Marx in its immediate wake, and the October 12 four-way conference all furnish substantial evidence that CorVel's concern with communication per se was not pretextual, but bona fide.

That brings us to Dr. Roger's main theme, which is that a network like CorVel has no business telling fully qualified physicians – under the guise of utilization

17

review – that they can't prescribe what they think is best for their patients if it is otherwise perfectly legal. On this point Dr. Roger stresses those provisions of his contract (like section 2.2 of the main agreement and section 2.1 of the provider agreement) which make clear the contracting physician is not required to do anything inconsistent with his or her best independent professional judgment.

On that precise point, and as framed, we actually agree with Dr. Roger. The contract plainly does not require the physician to compromise his or her independent professional judgment.[15] CorVel could not impose any *blanket* rule that Dr. Roger could not prescribe surface EMGs, wasabi rub, Gaba 2k rub, or theramine tablets – all otherwise perfectly lawful treatments – if Dr. Roger's independent professional judgment was that those treatments were indicated.

The contract, however, must be analyzed as a whole, and any otherwise apparently repugnant parts reconciled, if possible. (Civ. Code, §§ 1652 [need to reconcile apparent repugnancies]; 1641 [contract construed as a whole, with each part helping to interpret the other].) The provisions respecting independent physician judgment and the provisions requiring full cooperation with CorVel's utilization review system are readily reconciled. CorVel's utilization review system is based on the 2004 reforms, and those reforms expressly contemplate the possibility that treatments beyond the MTUS might be appropriate. But only after appropriate unitization review.

Section 4604.5, subdivision (a) provides: "The recommended guidelines set forth in the medical treatment utilization schedule adopted by the administrative director pursuant to Section 5307.27 shall be presumptively correct on the issue of extent and scope of medical treatment. *The presumption is rebuttable and may be controverted*

15    Dr. Rogers' two main cases authorities for his argument concerning independent professional judgment, however, don't really help him. *Ales v. Ryan* (1936) 8 Cal.2d 82, 103-104 merely demonstrates the unremarkable proposition that a surgeon is ultimately responsible for any sponges left inside a patient, even if a nurse thinks they have been all accounted for. And *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1514 is a case which actually allowed a *corporate* medical provider to *enforce* what the court opined was an otherwise illegal contract. (See *id.* at p. 1516.)

*by a preponderance of the scientific medical evidence establishing that a variance from the guidelines reasonably is required to cure or relieve the injured worker from the effects of his or her injury.* The presumption created is one affecting the burden of proof." (Italics added.)

A concomitant regulation fleshes out the theme of rebuttability. Section 9792.25(a) of the California Code of Regulations provides: "The MTUS is presumptively correct on the issue of extent and scope of medical treatment and diagnostic services addressed in the MTUS for the duration of the medical condition. The presumption is rebuttable and may be controverted by a preponderance of scientific medical evidence establishing that a variance from the schedule is reasonably required to cure or relieve the injured worker from the effects of his or her injury. The presumption created is one affecting the burden of proof."

Consistent with that scheme, CorVel's contract provides for a process of appeal focused on denials of treatments, including the opportunity to file a grievance in writing or talk to a customer service advocate. The advocate is tasked with investigating any denial and trying to achieve an informal resolution of the grievance. If anything, CorVel's contract appears to be more liberal than the Labor Code and regulations, because it is at least theoretically open to the possibility that a CorVel customer service advocate might construct a compromise in which nonstandard treatments were allowed in a given instance, even if the physician could not show that the nonstandard treatment was favored by a "*preponderance* of the scientific medical evidence." (Italics added.)[16]

---

[16] The MTUS only involves what the workers' compensation system *must* pay for. Employers retain the right to go beyond MTUS if they want. (See e.g., *Facundo-Guerrero v. Workers' Comp. Appeals Bd.* (2008) 163 Cal.App.4th 640, 652 [observing that the "employer has the sole discretion as to whether to approve payment for more" than 24 chiropractor visits]; *Sierra Pacific Industries v. Workers' Comp. Appeals Bd., supra,* 140 Cal.App.4th at p. 1509 ["It is true that in determining whether medical treatment is appropriate, the determination must be made based on the standards in effect when the treatment was provided. But that is not the issue here. Rather, the issue is who pays for the treatment; only if it meets the legal standard of reasonable and necessary under workers' compensation law does the employer have to pay for the treatment."].)

19

But Dr. Roger did not appreciate the implications of the flexibility afforded by the 2004 reforms or the appeals process built into CorVel's contract. Reconciling physician professional autonomy with the contract meant that physicians retained every right to prescribe nonstandard treatments for given patients, but *if* they did so, they would have to comply with both CorVel's appeals process and California's workers' compensation scheme, and go to the trouble of articulating why the nonstandard treatment was "reasonably required" to relieve a given worker of the effects of the worker's injury.

And *that*, as this record shows all too clearly, was more investment in time and energy than Dr. Roger was prepared to make. In his briefing, Dr. Roger characterizes CorVel's appeals process as a "virtual sham" such that if a provider abandoned it, it "hardly mattered" to CorVel. The only evidence he points to, however, to support that characterization is the fact the non-certification memos he received did not mention any of the literature supporting the nonstandard treatments. That absence, however, hardly proves the possibility of appeal was a sham – it merely shows that the independent reviewing physicians did not cite contrary authority. Dr. Roger ignores the terms of the contract and section 4604.5 which required *him* to have made the case for use of a particular nonstandard treatment for a particular patient. There was no reason for the independent reviewing physicians to cite authority if Dr. Roger presented none.

Finally, a major theme running through Dr. Roger's briefing is that CorVel had no real cause for complaint, because the only significant detriment it was incurring was the need to document denials of prescribed treatments, and Dr. Roger himself was perfectly willing to accept denial of a prescribed treatment and simply assert a workers' compensation lien later. That argument, however, represents a jujitsu reversal on the topic of administrative costs which inverts the proper relationship between the contracting parties. Under the contract and section 4604.5, it is Dr. Roger who bears the administrative burden of justifying a nonstandard treatment, not CorVel to justify its

20

denial.  In refusing to communicate with peer reviews, and in refusing to pursue appeals while continuing to write disproportionate numbers of prescriptions for nonstandard treatments, Dr. Roger was unilaterally inflicting administrative costs on CorVel – costs which it did not have to bear under its contract.  We therefore conclude CorVel had ample grounds on which to conclude Dr. Roger was in breach of the contract.

B.  *Process of Termination*

There is no avoiding the fact CorVel did not terminate Dr. Roger according to the three-step process outlined in section D of the utilization review agreement.  To be sure, Kaufman's letter dated June 7 *did* manage to state the "details" of *one* of the two general "problem" bases supporting termination for breach of contract (failure to communicate), and indicated some corrective action needed for that problem.  But Kaufman's letter clearly invoked the wrong provision in the main contract, namely section 6.3 relating to the jeopardization of patient care rather than section 6.4 relating to breach of the contract itself.  The letter also failed to explicitly complain about Dr. Roger's habitual prescription of nonstandard treatments.  And there was no mention at all of any "first offense" handling.

Moreover, there is nothing in this record to indicate compliance with the second, "second offense" step of the termination process, namely "education and counseling sessions" conducted by CorVel.  There is nothing from CorVel on the order of:  "You've had a first offense letter, now you're on your second offense, we are therefore requiring you to show up at X o'clock on Y date for a counseling session to be conducted by our medical director on the importance of adhering to the MTUS."

CorVel suggests that the numerous non-certification memos received by Dr. Roger constituted a sort of de facto series of education and counseling sessions, but that argument fails because of the actual content of those memos.  All of them were focused on particular patients and merely conveyed the conclusion one or more of the

21

nonstandard treatments was not accepted. At most, those memos constituted the outcome of the utilization review procedure. Naught was mentioned about breach of contract.

That said, we still affirm the judgment Dr. Roger take nothing by his breach of contract action. Among the elements of a cause of action for breach of contract are damages that *result from* the breach. (See *Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 511 ["Patent suffered no uncompensated detriment caused by Simpson's breach of contract. It was fully paid for its fire loss. It could not recover the cost of the premiums it had paid to the insurers because it did not incur that expense as a consequence of its contract with Simpson or as a result of Simpson's breach of contract. A breach of contract without damage is not actionable."].) While Dr. Roger's workers' compensation business may have declined considerably as a result of his termination, we cannot say that his termination was as a *result* of CorVel's failure to follow the three-step termination process. Termination was inevitable, independent of that process.

Substantial evidence for our conclusion is found in no less than: (a) Dr. Holladay's report, which inferentially shows that Dr. Roger made no patient-specific arguments in favor of any of the nonstandard treatments, only generalized ones; (b) Dr. Roger's own October 15 letter, inferentially showing there was no way he would stop prescribing any of the four nonstandard treatments; (c) the same letter's begrudging attitude toward physician review, basically restating Dr. Roger's position he did not have the time to be available if a reviewing physician called to talk about a nonstandard treatment; (d) the complete absence of any willingness on Dr. Roger's part to take the necessary time and trouble to articulate patient specific reasons for the use of any of the four nonstandard treatments as part of CorVel's appeals process; (e) the absence of any initiation of any appeal or dispute resolution process, as was his right under the contract, on Dr. Roger's part; and (f) Dr. Roger's willingness to engage in the deceptive practice of upcoding rather than author the necessary memoranda to justify a given treatment to a

22

given patient. In sum, the trial court could reasonably conclude Dr. Rogers was going to continue to refuse to do the work inherently necessary to justify his prescriptions if he was going to continue to prescribe the four nonstandard treatments.

## C. *Common Law Fair Procedure*

Lastly, Dr. Roger presents a claim which is, strictly speaking, extrinsic to his contract with CorVel, namely a denial of the common law right of fair procedure to his membership in the network. (See generally, *Potvin, supra*, 22 Cal.4th 1060.) The answer to this claim, however, is that substantial evidence shows Dr. Roger received a fair procedure, even if it wasn't the *precise* procedure specified in CorVel's contract.

Procedure is fair if the relevant decision is both "substantively rational" and "reached in a manner that is procedurally fair." (*Palm Medical Group, Inc. v. State Comp. Ins. Fund* (2008) 161 Cal.App.4th 206, 222.)

Here, the decision to terminate was certainly rational. In order to give the MTUS system some flexibility, section 4604.5 and CorVel's contract work imposed on physicians who prescribe outside of the MTUS the burden of taking the laboring oar of justifying their prescriptions. But Dr. Roger made it abundantly clear to CorVel that he did not feel it a worthwhile use of his time to undertake such justifications. His disobliging ways were a matter on which he was unwilling to compromise. At most he thought it sufficient merely to cite to any reviewing physician who managed to reach him by phone the literature supporting his nonstandard treatments.

And the termination was procedurally fair. Kaufman and CorVel gave Dr. Roger every chance to work out a resolution short of termination. That eventuality was never concealed or downplayed and CorVel gave Dr. Roger plenty of notice and abundant opportunity to be heard.

23

## DISPOSITION

The judgment is affirmed.  Respondent to recover costs.


                                    BEDSWORTH, J.

WE CONCUR:



RYLAARSDAM, ACTING P. J.



THOMPSON, J.