FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 8 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

KJERSTI FLAA, an individual; ROSA
GAMAZO ROBBINS,

          Plaintiffs-Appellants,

     v.

HOLLYWOOD FOREIGN PRESS
ASSOCIATION, a California Mutual Benefit
Corporation; AUD BERGGREN MORISSE,
an individual; TINA JOHNK
CHRISTENSEN, an individual; ANIKO
SKORKA NAVAI, an individual; MEHER
TATNA, an individual,

          Defendants-Appellees.

No.    21-55347

D.C. No. 2:20-cv-06974-SB-E

OPINION

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted February 16, 2022
Pasadena, California

Before:  John B. Owens and Eric D. Miller, Circuit Judges, and Dana L.
Christensen,* District Judge.

Opinion by Judge Miller

_____

        *    The Honorable Dana L. Christensen, United States District Judge for
the District of Montana, sitting by designation.

# SUMMARY[**]

## Antitrust

The panel affirmed the district court's dismissal of an antitrust action brought by two entertainment journalists who challenged the membership policies of the Hollywood Foreign Press Association.

The HFPA is a California non-profit mutual benefit corporation whose members are involved in reporting for media outlets outside of the United States. The members are offered advantages such as access to Hollywood talent granted by movie studios. The HFPA strictly limits the admission of new members.

The panel affirmed the dismissal of the journalists' antitrust claims. The journalists alleged that the HFPA's exclusionary membership practices violated section 1 (restraint of trade) and section 2 (monopolization) of the Sherman Act, as well as California's Cartwright Act. The panel held that the journalists did not establish a per se restraint of trade under section 1 on either a theory that the HPFA's membership practices have produced an anti-competitive group boycott of all non-member foreign entertainment journalists, or a theory that the HFPA members have unlawfully agreed to divide the foreign entertainment news market among themselves. The panel held that the journalists also failed to state a claim that the HFPA's practices were unlawful under a rule of reason analysis.

The panel held that a group boycott may be per se unlawful when the group of competitors cuts off access to a supply, facility, or market necessary to enable the boycotted firm to compete; when the group possesses a dominant position in the relevant market; or when the criticized practice is not justified by plausible arguments that it is intended to enhance overall efficiency and make markets more competitive. The panel concluded that the HFPA's admissions practices possessed none of these characteristics.

The panel held that the journalists did not state a claim of per se liability based on a horizontal market division agreement because this theory was inconsistent with

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

statements in the complaint that the HFPA's members do not participate in the same product market.

The panel held that, under a rule of reason analysis, the journalists failed to allege that the HFPA had market power in any reasonably defined market.

The panel also affirmed the dismissal of the journalists' claim based on California's right of fair procedure, which protects, in certain situations, against arbitrary decisions by private organizations. The panel held that the right of fair procedure did not apply because, under California law, the HFPA was not a quasi-public organization.

Finally, the panel affirmed the district court's dismissal for lack of subject-matter jurisdiction of the journalists' claim seeking a declaration that the HFPA's bylaws were inconsistent with its federal tax-exempt status. The panel held that this claim fell within the Declaratory Judgment Act's jurisdictional bar to declaratory relief related to federal tax controversies.

---

## COUNSEL

---

David W. Quinto (argued) and Joanna Ardalan, One LLP, Beverly Hills, California, for Plaintiffs-Appellants.

Samir Deger-Sen (argued) and Mateo de la Torre, Latham & Watkins LLP, New York, New York; Christopher S. Yates, Latham & Watkins LLP, San Francisco, California; Marvin S. Putnam and Robert J. Ellison, Latham & Watkins, Los Angeles, California; for Defendants-Appellees.

MILLER, Circuit Judge:

Kjersti Flaa and Rosa Gamazo Robbins are entertainment journalists who seek admission to the Hollywood Foreign Press Association (HFPA). The journalists challenge the HFPA's membership policies under federal and state antitrust laws and California's right of fair procedure. They also seek a declaration that the HFPA's bylaws conflict with its tax-exempt status. The district court dismissed their complaint for failure to state a claim and for lack of subject-matter jurisdiction. We affirm.

I

Because this is an appeal from a motion to dismiss, we assume the truth of the facts alleged in the complaint. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1266 (9th Cir. 2022).

Flaa and Gamazo are entertainment journalists based in Los Angeles. Flaa began her career in Norway, where she reported on entertainment for several Norwegian publications. In 2007, Flaa moved to New York, where she reported for several Norwegian newspapers and magazines and served as the lead interviewer for the "biggest entertainment television show in Norway." In 2015, she moved to Southern California. There, she founded and served as the creative director of a production company that produced a short-form entertainment series, "Hollywood Stories," that was carried on Scandinavia's largest streaming network and was sold

to more than 40 countries. Flaa also hosts a celebrity interview series on YouTube, "Flaawsome Talk," that has been viewed nearly 70 million times. Flaa's work has earned her professional awards and recognition. For example, Flaa was profiled by "major outlets in Norway concerning her success reporting on celebrities."

Gamazo, a citizen of Spain, has also been a successful entertainment journalist for many years. She has "report[ed] for outlets around the world" and has served as a correspondent for numerous outlets, including Mediaset España, since 2013, reporting on entertainment, trends, and restaurants in Los Angeles. Gamazo conducts celebrity interviews and publishes them online, and she also serves as a correspondent for *La Razón*, a Spanish newspaper.

Flaa and Gamazo seek admission to the HFPA. Founded in 1943, the HFPA is a California non-profit mutual-benefit corporation best known for hosting the annual Golden Globe Awards. At the time the complaint was filed, the HFPA had 85 members, all of whom were involved in reporting for media outlets outside of the United States. According to the complaint, "[o]nly half [of] the HFPA's members are considered truly 'active,'" and only "[t]wo or three dozen HFPA members . . . are legitimate, respected media figures," while the rest are "intermittent freelancers at best." The HFPA's stated purposes include "promoting interest in the study of the arts," "providing facilities for education and instruction

3

in the arts of motion picture production," and "establishing favorable relations and cultural ties between foreign countries and the USA."

Membership in the HFPA offers significant advantages. Movie studios provide HFPA members with access to Hollywood talent that non-HFPA members lack: HFPA members receive opportunities to interview and interact with popular actors, directors, and producers. Studios grant HFPA members such privileges in order to gain favor with the individuals responsible for voting on the Golden Globe Awards. HFPA members also reap financial benefits. Members receive invitations to all-expenses-paid excursions to film festivals and press junkets, and are paid directly by the HFPA for performing what the complaint describes as trivial, makeweight tasks.

According to the complaint, membership in the HFPA is increasingly vital to success as a foreign entertainment journalist. Until a few years ago, non-HFPA foreign journalists could compete for the few interview and press-junket slots available to non-members. Now, however, those slots are given to "bloggers and social media influencers." The lack of interview opportunities has been "economically devastating for non-member foreign reporters."

It is no surprise, then, that journalists like Flaa and Gamazo seek HFPA membership. But the HFPA strictly limits the admission of new members. At the time the complaint was filed, a journalist seeking HFPA membership was required

4

to submit two letters of sponsorship from active HFPA members, provide 24 articles written by the applicant in the last three years, demonstrate membership in the Motion Picture Association of America, and receive a majority vote of the HFPA's active members, among other requirements. The HFPA admitted only one new member in 2018, and no new members in 2019.

Flaa unsuccessfully applied for membership in 2018, 2019, and 2020. Gamazo attempted to apply in 2015, 2017, 2018, and 2019, but she could not find two members to sponsor her application. The complaint asserts that the HFPA's restrictive membership practices serve to insulate HFPA members from competition and protect the financial benefits that accrue to them.

In August 2020, Flaa brought this action in the Central District of California against the HFPA and several of its individual members. She alleged that the HFPA's refusal to admit her and other qualified journalists violated federal and state antitrust law and California's common-law right to fair procedure. Flaa also sought a declaratory judgment that the HFPA's bylaws conflict with its obligations as a tax-exempt mutual-benefit corporation under 26 U.S.C. § 501(c)(6).

The district court dismissed the complaint. The court dismissed the antitrust claims because Flaa "fail[ed] to plead a facially sustainable market definition." It dismissed the fair-procedure claim because the California right to fair procedure applies only "to an organization that 'occupies a quasi public position similar to

5

that of a public service business,'" and the court determined that the HFPA is not such an organization. (quoting *James v. Marinship Corp.*, 155 P.2d 329, 335 (Cal. 1944)). And it dismissed the declaratory-judgment claim for lack of jurisdiction because 28 U.S.C. § 2201(a) generally bars federal courts from deciding claims for declaratory relief relating to federal taxes.

The district court's dismissal was with prejudice, except as to the antitrust claims, which the court allowed Flaa to amend. Flaa then joined Gamazo as a co-plaintiff and filed an amended complaint. In the amended complaint, the journalists asserted that the HFPA had committed per se antitrust violations by engaging in a group boycott and agreeing upon a horizontal market division.

The district court dismissed the amended complaint and denied further leave to amend. The court rejected the group-boycott theory because the journalists did not "offer non-conclusory allegations that the HFPA or its members have market power" or "plead facts establishing a joint effort among horizontal competitors." The court rejected the market-division theory because, as it understood the complaint, "HFPA members are generally not able to compete with one another because of the peculiar characteristics of each geographic submarket," and "[i]f HFPA members cannot compete, then they cannot agree to divide a market." The court also rejected the antitrust claims under the rule of reason because "the allegations in the amended complaint remain 'hopelessly muddled as to what

product market (or markets) are at issue here,'" and the complaint did not plausibly allege that the HFPA has market power. (quoting *Ticketmaster LLC v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1195 (C.D. Cal. 2008)).

The journalists appeal. We review the district court's dismissal for lack of subject-matter jurisdiction or for failure to state a claim de novo. *Gilbert v. United States*, 998 F.3d 410, 413 (9th Cir. 2021); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 451 (9th Cir. 2021).

II

We begin with the journalists' antitrust claims. The journalists allege that the HFPA's exclusionary membership practices violate section 1 (restraint of trade) and section 2 (monopolization) of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700–16770. Because the analysis under the Cartwright Act mirrors the analysis under the Sherman Act, we consider both claims together. *See PLS.com, LLC v. National Ass'n of Realtors*, 32 F.4th 824, 831–32 (9th Cir. 2022). And because the legal tests used for sections 1 and 2 of the Sherman Act are similar, we can "review claims under each section simultaneously." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). If "a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *Id.* (emphasis omitted).

Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Notwithstanding the apparent breadth of that provision, the Supreme Court has long interpreted it "to outlaw only *unreasonable* restraints." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

A restraint can be unreasonable in two different ways. "A small group of restraints are unreasonable *per se* because they 'always or almost always tend to restrict competition and decrease output.'" *American Express*, 138 S. Ct. at 2283 (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). When a restraint is "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality," it is illegal per se. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *National Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). We assess all other restraints under the "rule of reason." *American Express*, 138 S. Ct. at 2284; *Dagher*, 547 U.S. at 5 (noting that the Court "presumptively applies rule of reason analysis"). Under the rule of reason, a court examines "'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed,' to determine the effect on competition in the relevant product market." *In re Nat'l Football League's Sunday*

*Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019) (quoting *National Soc'y of Pro. Eng'rs*, 435 U.S. at 692).

The journalists assert two theories of per se liability. First, they allege that the HFPA's membership practices have produced an anti-competitive group boycott of all non-member foreign entertainment journalists. Second, they allege that HFPA members have unlawfully agreed to divide the foreign entertainment news market among themselves. Alternatively, the journalists argue that the HFPA's practices are unlawful under the rule of reason. We agree with the district court that the journalists have not stated a claim under any of those theories.

A

In its traditional form, a group boycott (also known as a concerted refusal to deal) involves "a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *PLS.com*, 32 F.4th at 834 (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)). The boycotting group may, for example, "deprive would-be competitors of a trade relationship" necessary to survive in the market, or "induc[e] suppliers not to sell to potential competitors." *Id.* (quoting *Smith*, 593 F.2d at 1178). A group boycott may also involve "competing firms engaged in a cooperative venture excluding other competing firms." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1411 (9th Cir. 1991).

9

Determining "which group boycotts qualify as *per se* violations of the Sherman Act has been a source of confusion for decades." *PLS.com*, 32 F.4th at 835. While group boycotts have sometimes been described as unlawful per se, *see FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (recognizing that the Supreme Court has "in the past stated that group boycotts are unlawful *per se*"), that statement sweeps too broadly: Some practices that resemble a group boycott are per se unlawful, while others are not. *See Bhan*, 929 F.2d at 1410 ("[S]ome, but not all, boycotts are considered illegal per se."). The Supreme Court has cautioned that "the category of restraints classed as group boycotts is not to be expanded indiscriminately," *Indiana Fed'n of Dentists*, 476 U.S. at 458, and that "[s]ome care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation," *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).

In *Northwest Wholesale Stationers*, the Supreme Court clarified that the "mere allegation" of a group boycott is not sufficient to justify per se condemnation "because not all concerted refusals to deal are predominantly anticompetitive." 472 U.S. at 298. Certain indicia may suggest that per se treatment is appropriate, including whether the group of competitors "cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete," whether the group "possesse[s] a dominant position in the relevant

market," and whether the criticized practice is "not justified by plausible arguments that [it is] intended to enhance overall efficiency and make markets more competitive." *Id.* at 294; *see also id.* at 296 ("Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion [from the cooperative] is virtually always likely to have an anticompetitive effect is not warranted."); *PLS.com*, 32 F.4th at 835; *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 949–50 (9th Cir. 1998). When a group boycott possesses some or all of these characteristics, "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote," justifying application of the per se rule. *Northwest Wholesale Stationers*, 472 U.S. at 294.

The journalists allege that the HFPA's membership practices amount to a group boycott that is per se unlawful. By "exclud[ing] from membership all objectively qualified applicants who might possibly compete with an existing member," they say, the HFPA engages in a "group boycott of everyone who might compete with its members." We reject that argument because the HFPA's admissions practices possess none of the characteristics that the Supreme Court has identified as calling for per se condemnation.

First, the HFPA has not "cut off access to a supply . . . necessary to enable the boycotted firm to compete." *Northwest Wholesale Stationers*, 472 U.S. at 294;

*see Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 878 (9th Cir. 1987). The journalists assert that HFPA members are provided unique opportunities to interview and interact with Hollywood movie stars, producers, and directors, which they claim are essential to success as an entertainment journalist. They analogize this case to *Associated Press v. United States*, in which the Supreme Court concluded that the bylaws of the Associated Press constituted a per se violation because the Associated Press was "the chief single source of news for the American press," and its bylaws prohibited members from sharing news with non-members. 326 U.S. 1, 11 n.7 (1945); *see id.* at 18 (noting that members "control 96% of the total circulation in the United States").

Critically, however, the HFPA does not control access to talent—Hollywood studios do. As the complaint concedes, Hollywood studios provide HFPA members with interview opportunities in order to gain favor with the individuals who organize and vote on the Golden Globe Awards. The complaint does not allege that the HFPA entered into an exclusive agreement with the studios or otherwise "persuad[ed] or coerc[ed]" the studios to deny opportunities to non-HFPA members. *Northwest Wholesale Stationers*, 472 U.S. at 294 (citation omitted). Instead, the distribution of interview opportunities reflects the studios' independent business judgment.

We do not question that membership in the HFPA provides economic benefits, in part because the ability to vote on the Golden Globe Awards can generate valuable business opportunities. But membership in almost any trade association provides some kind of economic benefit. It does not follow that every trade association must open itself to all comers.

Second, the HFPA lacks market power. *See Northwest Wholesale Stationers*, 472 U.S. at 294, 296; *Indiana Fed'n of Dentists*, 476 U.S. at 458 (noting that "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor"). As we explain in more detail below, the complaint does not plausibly allege that the HFPA—a group of 85 entertainment journalists, only half of whom are "active" journalists—possesses market power in any reasonably defined market.

But even if the HFPA cut off access to an essential competitive resource or possessed market power, we still would hesitate to apply the per se rule to its membership practices. Per se condemnation is appropriate only when the challenged practice is "not justified by plausible arguments that [it is] intended to enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers*, 472 U.S. at 294; *see also Paladin Assocs., Inc. v. Montana Power Co.,* 328 F.3d 1145, 1155 (9th Cir. 2003). In this case, the challenged

activity—exclusion from a small, voluntary professional organization—is not a practice that "would almost always tend to be predominantly anti-competitive" such that it can be condemned without further inquiry into its actual competitive effects. *Bhan*, 929 F.2d at 1412. In that respect, it differs from the practice at issue in *Associated Press*, which involved a large organization whose membership explicitly excluded competitors, and that expressly forbade members from dealing with non-members. 326 U.S. at 4.

The Supreme Court has cautioned us against "condemn[ing] rules adopted by professional associations as unreasonable *per se*" when the "economic impact" of those rules is "not immediately obvious." *Indiana Fed'n of Dentists*, 476 U.S. at 458–59. Keeping with that guidance, courts are hesitant to apply the per se rule to dictate the admissions practices of trade associations and professional organizations. *See, e.g.*, *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n,* 672 F.2d 1280, 1285 (7th Cir. 1982) ("Because they often depart from the traditional group boycott paradigm, membership arrangements in trade associations form an exception to the general rule that group boycotts constitute per se antitrust violations."); *National Ass'n of Rev. Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found*., 64 F.3d 1130, 1133 (8th Cir. 1995) (applying the rule of reason because the organization's membership policies

"appear[ed] to serve some legitimate purpose necessary to [its] proper functioning").

The HFPA's membership practices are justified by plausible pro-competitive explanations. Anyone who has seen movie advertising is aware that there is robust competition in the market for motion-picture awards. In order to compete more effectively in that market, the HFPA could decide to limit its membership to prevent the organization from becoming unwieldy in size, and it could choose to select members who will add particular viewpoints to the Golden Globe voting pool. Whether that is a sensible approach is a question to be decided not by us, but by the moviegoing public, which can give Golden Globe Awards whatever weight it thinks they deserve.

While some professional organizations may seek to include everyone practicing in a particular field, others may choose to limit their membership to those that they deem to be among the elite of the profession. For example, the HFPA says that it seeks to "enhanc[e] the subject-matter expertise" of member journalists. Such an organization requires some degree of exclusivity in order to function effectively. Its restrictive admission policy is not inherently anticompetitive, so the organization generally is "entitled to determine its members and is certainly not required to accept every applicant." Phillip E. Areeda & Herbert Hovenkamp, 13 *Antitrust Law* ¶ 2214c, at 341 (4th ed. 2019).

15

Because the membership decisions of a small, private professional organization like the HFPA are not so likely to prove "harmful to competition and so rarely prove justified" to warrant condemnation as a per se unreasonable group boycott, we conclude that the HFPA's admissions practices should instead be analyzed under the rule of reason. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998); *see Bhan*, 929 F.2d at 1412.

B

The journalists allege that HFPA members have agreed to divide the foreign market for entertainment news, allowing generally only one member, and at most several members, to report for a given country or a given outlet. They say that the HFPA's rules "enshrine the members' purported right to protection from competition" by prohibiting a member from attempting to write for a publication that is already represented by another member. And they suggest that the HFPA uses its membership rules to enforce that division by ensuring that the organization does not "admit anyone who might possibly compete with an existing member" by encroaching on "the geographic market or markets allocated to [an incumbent] reporter."

"[A] classic horizontal market division agreement" is one "in which competitors at the same level agree to divide up the market for a given product," and it is unlawful per se. *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th

Cir. 1996); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608–09, 612 (1972). Thus, market division could certainly form the basis for a viable antitrust claim. But a plaintiff can plead itself out of court by alleging facts that are inconsistent with its claim, and we agree with the district court that the journalists have done so here. *See Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).

As an initial matter, the market-division theory is difficult to reconcile with the statements in the complaint that the HFPA's members do not participate in the same product market: Some members "are journalists while others are photographers; some journalists report in print while others report for electronic media; some report for outlets in the same country but in different languages." In addition, even among those members in the same field of print reporting, the complaint says that competition from one country to another would not be possible, quite apart from any restrictions the HFPA might impose. The complaint alleges that "each country has unique outlets for [entertainment] reporting" and requires "country-specific news reporters and news stories." That is because "stories by reporters from particular countries written for consumers in those countries will be sensitive to nuances of language and will reflect knowledge of the distinct cultures, interests, and concerns of their [local] readership or viewership." As the complaint describes the market, a reporter from one country cannot provide

stories for outlets in other countries. For example, the complaint says that "an entertainment article appearing in the German edition of a U.S.-based magazine is typically written for the German edition by a German reporter and would not typically be translated into Hungarian for the Hungarian edition of the same magazine."

The complaint thus describes not one global market for entertainment news, but separate geographic submarkets. As the district court observed, those allegations mean that HFPA members from different countries cannot compete with each other. If the members are unable to compete in the same market, they are unable to agree to divide the market. *See Metro Indus.*, 82 F.3d at 844 (noting that a market-division claim requires an "agreement *between competitors* at the same market level" (emphasis added)); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (holding per se unlawful "an agreement to allocate or divide customers between competitors *within the same horizontal market*" (emphasis added)); *Topco*, 405 U.S. at 608.

To be fair, the complaint does allege that HFPA members regularly switch countries, an allegation that could be taken to suggest that in the absence of the alleged market division, there might be more competition among members. In addition—although the complaint does not make this point—the challenged rules would seem to be unnecessary if members in different countries truly are unable to

18

compete with one another. Thus, the district court's reading of the complaint might be thought ungenerous.

But on appeal, the journalists have not meaningfully addressed the district court's reasoning, argued that the court misunderstood their complaint, or suggested how they might amend the complaint to solve the problem the court identified. We therefore agree with the district court that the complaint defeats its own market-division theory.

C

Because the HFPA's membership practices are not unlawful per se, we apply the rule of reason. The rule of reason involves "a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *American Express*, 138 S. Ct. at 2284 (alteration in original) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). The purpose of that inquiry is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Under the rule of reason, "a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and

19

that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).

In the amended complaint, the journalists proposed a market definition of "reporting on news, events, and personalities related to American movies for media outlets outside the United States," and they asserted that individual foreign countries constitute discrete geographic submarkets. The district court rejected that market definition as "artificially narrow" and "hopelessly muddled." The district court also concluded that the amended complaint did not plausibly allege that the HFPA possesses market power or that its membership policies harm competition.

Assuming, without deciding, that the journalists pleaded a legally cognizable market definition (or that they could amend their complaint to do so), we nevertheless conclude the district court correctly dismissed the journalists' antitrust claims under the rule of reason. We agree with the district court that the HFPA lacks market power in any reasonably defined market.

"A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint." *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008). Though courts define "market power" in various ways, it is commonly understood as "the power to control prices or exclude competition." *Paladin*, 328 F.3d at 1158; *accord* Areeda & Hovenkamp, 13 *Antitrust Law* ¶ 2211c, at 318 (noting that "the power to exclude [competitors]

20

from the market" is the critical inquiry in a case involving allegations of an unlawful refusal to deal). We rely on market power to help distinguish between restraints that are likely to substantially impair competition and those that are not. *See Indiana Fed'n of Dentists*, 476 U.S. at 460–61 (noting that market power is a "surrogate for detrimental [competitive] effects" (citation omitted)); *Qualcomm*, 969 F.3d at 989.

The HFPA lacks market power in the journalists' proposed market—or any other reasonably defined market. The HFPA has 85 members, and according to the complaint, only half of those 85 members are "active" journalists, and only "[t]wo or three dozen" members "are legitimate, respected media figures." The rest are "intermittent freelancers at best." The complaint contains no quantitative allegations suggesting that this small group of journalists possesses market power in the global market for news about American movies or entertainment, and while that omission is not fatal by itself, the journalists have not pleaded any other facts that would move the hypothesis of market power "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Nor is it plausible that the handful of HFPA members (often, only a single member) "assigned" to report for a given country possesses market power in any country-specific submarket. As the district court observed, the journalists "do not describe an organization wielding market power of global proportions." And despite a

21

vague statement that they "should be allowed to amend their claims," the journalists have not offered any explanation of how further amendment of the complaint could buttress their allegations of market power.

To the contrary, the journalists describe a healthy and competitive market that is responsive to shifting consumer preferences and technological change. The journalists complain that the limited interview slots once available to non-HFPA members now go to "bloggers and social media influencers," driving traditional, print journalists out of the market. That is nothing more than the competitive process at work: Presumably in response to growing consumer demand for online content, some market participants, like bloggers and social media influencers, have become more successful, while others have become less successful. Consumers abroad seeking news about American movies and entertainment are not lacking in choices, and the complaint does not allege otherwise. In addition to news produced by HFPA members, the complaint says that consumers can turn to news produced by non-HFPA journalists like Flaa and Gamazo (who, despite limited access to Hollywood talent, have successfully produced entertainment journalism for years), content produced by the "bloggers and social media influencers" we have already mentioned, and wire-service reporting. The presence of so many market participants suggests that there is robust competition within any reasonably defined market.

The HFPA's lack of market power is also shown by its inability to "exclude competition" like Flaa and Gamazo, who have enjoyed professional success for years even without HFPA membership. *See Paladin*, 328 F.3d at 1158. For example, Flaa hosts a widely viewed celebrity-interview series on YouTube (notwithstanding the fact that the complaint asserts that non-HFPA members have been effectively excluded from interviewing Hollywood talent), and has received numerous journalism awards and accolades. Gamazo has reported "for outlets around the world," produces celebrity interviews, and serves as a correspondent for several Spanish newspapers. While "the fact that an agreement to restrain trade does not inhibit competition in all of the objects of that trade" is not dispositive, Flaa and Gamazo's success still supports the conclusion that the HFPA does not control any relevant market. *Associated Press*, 326 U.S. at 17.

The journalists argue that their past success is irrelevant to the question of whether the HFPA has the power to exclude competitors because the market is rapidly evolving, making HFPA membership more essential now than it once was. But the complaint does not allege that the increased importance of HFPA membership has anything to do with an increase in the HFPA's market power. Rather, it seems that the newfound "necessity" of HFPA membership has been driven by developments in the market, such as the rising prominence of online

content producers and reluctance by media outlets to pay for on-site entertainment journalists based in Los Angeles.

Because the complaint does not plausibly allege market power, we need go no further. We therefore need not consider the possible pro-competitive justifications for the HFPA's policies—though as mentioned above, several are apparent. Nor need we consider whether the journalists have adequately alleged antitrust injury. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). The HFPA's lack of market power is fatal to the journalists' claims under the rule of reason.

## III

We now turn to the journalists' claim based on California's right of fair procedure. In California, the "common law right to fair procedure . . . protect[s], in certain situations, against arbitrary decisions by private organizations." *Potvin v. Metropolitan Life Ins. Co.*, 997 P.2d 1153, 1156 (Cal. 2000). The right protects individuals "seeking membership in, or expelled by, private organizations that occupy positions of special importance in society." *California Dental Ass'n v. American Dental Ass'n*, 590 P.2d 401, 405 (Cal. 1979). When the right of fair procedure attaches, the organization's decision making "must be both substantively rational and procedurally fair." *Pinsker v. Pacific Coast Soc'y of Orthodontists*, 526 P.2d 253, 260 (Cal. 1974).

The right of fair procedure is a limited one that applies to the decisions of only a relatively small class of private organizations. Specifically, it applies only to private entities that "affect[] the public interest" such that they are viewed as "quasi-public in nature." *Potvin*, 997 P.2d at 1159 (citation omitted). To determine if an organization is quasi-public, California courts look to factors such as whether the organization produces particularly important products or services, provides express or implied representations to the public, receives legislative recognition of its public character, or possesses superior bargaining power. *See id.* Examples of quasi-public organizations include labor unions and medical and dental licensing organizations. *Ezekial v. Winkley*, 572 P.2d 32, 35 (Cal. 1977); *Potvin*, 997 P.2d at 1157–59.

Under California law, the HFPA is not a quasi-public organization. The HFPA does not provide "important products or services" to the public, does not make representations about the qualifications of its members (as a licensing entity does), and has received no legislative recognition as a quasi-public association. *See Potvin*, 997 P.2d at 1159 (citation omitted). Unlike the organizations to which California courts have applied the right, the HFPA is not open to all qualified members of a profession (as a labor union or medical association is), nor does it "foreclose from practice one who had already obtained a professional license." *Ezekial*, 572 P.2d at 35. Rather, the HFPA is a small, private, and voluntary

25

association of journalists which, according to the complaint, exists primarily for the benefit of its members, not the public. It is not an organization that is "tinged with public stature or purpose," *Salkin v. California Dental Ass'n*, 224 Cal. Rptr. 352, 357 (Ct. App. 1986) (citation omitted), or that occupies a "position[] of special importance in society," *California Dental Ass'n*, 590 P.2d at 405. The journalists cite no case applying the right of fair procedure to an organization even remotely similar to the HFPA.

The journalists contend that the right applies to the HFPA because their exclusion from the organization "greatly impair[s]" their careers as entertainment journalists. But as demonstrated by the limited group of organizations to which California courts have applied the right, it is not enough that exclusion produces professional or economic harm. *See Potvin,* 997 P.2d at 1159 ("The private organizations in our [fair procedure cases] . . . all shared an attribute of significance. . . . Each one was a private entity affecting the public interest."). Thus, even if we were to conclude that membership in the HFPA is a "practical necessity" to success as an entertainment journalist, *Pinsker v. Pacific Coast Soc'y of Orthodontists*, 460 P.2d 495, 499 (Cal. 1969), the right still would not apply because the HFPA is not a quasi-public organization.

The journalists argue that the HFPA is quasi-public because the entertainment industry is economically significant. But the California Court of

26

Appeal has rejected a nearly identical argument. In *Yari v. Producers Guild of Am., Inc.*, the court held that the Academy of Motion Picture Arts and Sciences and the Producers Guild of America are not "quasi-public." 73 Cal. Rptr. 3d 803, 805, 809 (Ct. App. 2008). The court recognized that "the movie industry is an important industry" in which "the public is interested," but it explained that those facts themselves do not establish "that industry-related organizations like defendants operate in the public interest." *Id*. at 809.

Similarly misplaced is the journalists' observation that "news reporting is in the public interest." It is not enough that an *industry* is important to the public; rather, the right of fair procedure applies only when an *organization* possesses characteristics that make it quasi-public in nature. *See Potvin*, 997 P.2d at 1159 (listing factors that an *organization* must possess to be quasi-public); *Yari*, 73 Cal. Rptr. 3d at 809. The HFPA does not.

Finally, the journalists emphasize that the HFPA is a tax-exempt section 501(c)(6) organization. As the district court observed, accepting this theory would "extend [the right] to all such non-profit organizations," and the California courts have given no indication that the fair-procedure doctrine applies so broadly. The HFPA's tax-exempt status cannot support a conclusion that the fair-procedure doctrine applies.

IV

That leaves the claim for declaratory relief. The journalists seek a declaration that the HFPA's bylaws "are unlawful in light of the HFPA's commitments and obligations as a tax-exempt Section 501(c)(6) mutual benefit corporation" because the HFPA's bylaws serve to benefit its members rather than the industry as a whole. The district court correctly dismissed that claim for lack of subject-matter jurisdiction.

The Declaratory Judgment Act grants federal courts the power to "declare the rights . . . of any interested party seeking such declaration," but it expressly provides that declaratory relief is unavailable "with respect to Federal taxes." 28 U.S.C. § 2201(a). That language creates a jurisdictional bar to declaratory relief related to federal tax controversies. *See Bluetooth SIG Inc. v. United States*, 611 F.3d 617, 619 n.1 (9th Cir. 2010); *Gilbert*, 998 F.3d at 413–15. The statute provides an exception to the tax-related jurisdictional bar for "actions brought under section 7428 of the Internal Revenue Code." 28 U.S.C. § 2201(a). Section 7428, in turn, provides jurisdiction to determine whether an organization is entitled to tax-exempt status, but only in actions brought by the organization itself. *See* 26 U.S.C. § 7428(a)(1)(E), (b)(1).

The journalists seek a declaration that the HFPA's bylaws are inconsistent with its tax-exempt status. Such a declaration is not permitted under section 7428, which would provide jurisdiction only if the HFPA itself were to challenge its own

tax status. *See* 26 U.S.C. § 7428(b)(1); 28 U.S.C. § 2201(a). Because the declaration the journalists seek is not covered by the exception to the jurisdictional bar found in section 7428, and is otherwise a declaration "with respect to Federal taxes," 28 U.S.C. § 2201(a), the jurisdictional bar applies.

The journalists argue that they do not directly challenge the HFPA's tax-exempt status or the amount of taxes it owes, but merely seek a declaration that the HFPA's bylaws conflict with the "obligations flowing" from its tax-exempt status. But a declaration that the HFPA's bylaws conflict with its tax status would be functionally equivalent to a declaration that the organization is violating the tax laws. Such a declaration would necessarily imply that the HFPA is not entitled to its tax-exempt status, and it would serve no purpose but to threaten the HFPA with the loss of that status. *Cf. Gilbert*, 998 F.3d at 415 (applying the jurisdictional bar because "the ultimate issue in this case is the parties' tax obligations *flowing from* their real estate transaction . . . even though [they] are not seeking to avoid tax liability" (emphasis added)). The requested declaration is therefore one "with respect to Federal taxes," so the district court correctly dismissed the claim for lack of subject-matter jurisdiction.

**AFFIRMED.**